UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| i2 INC., a Delaware corporation, i2 LIMITED, a British limited company registered in England and Wales.<br><br>Plaintiff,<br><br>v.<br><br>PALANTIR TECHNOLOGIES, INC., a Delaware Corporation, SHYAM SANKAR, an individual, DR. ASHER SINENSKY, an individual, SRS ENTERPRISES, LLC, a Florida limited liability company, NOCHUR SANKAR, an individual,<br><br>Defendants. | **CIVIL ACTION NO. 1:10CV885 – LO/JFA** |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER OR, IN THE ALTERNATIVE, FOR A PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS


**Page**

I. Introduction ........ 1
II. Statement of Facts ........ 2
  A. The Competition Between i2 and Palantir ........ 2
  B. i2's Products ........ 3
  C. Defendants Shyam Sankar and Nochur Sankar Contact i2 Under the Guise of SRS Enterprises ........ 7
  D. Defendants Misappropriate i2's Technology by Fraudulently Acquiring Licenses to i2 Technology ........ 8
  E. Palantir's Unlawful Use of i2's Products and Trade Secrets ........ 12
III. Argument ........ 14
  A. Legal Standard ........ 14
  B. i2 Is Likely to Succeed on the Merits for Each Claim on Which It Seeks Injunctive Relief ........ 14
    i. Misappropriation of Trade Secrets ........ 15
      a. i2's Trade Secrets ........ 15
      b. SRS Enterprises, Shyam Sankar, and Nochur Sankar Misappropriated i2's Trade Secrets ........ 17
      c. Palantir, Shyam Sankar, and Asher Sinensky Misappropriated i2's Trade Secrets ........ 19
    ii. Breach of Contract ........ 22
    iii. Copyright Infringement ........ 23
  C. i2 Will Continue to Suffer Irreparable Harm if Defendants Are Permitted to Continue Possessing and Using i2's Proprietary Technology ........ 26
  D. The Balance of Equities Weighs Heavily in i2's Favor ........ 30
  E. Public Policy Considerations Favor the Prompt Injunction of Defendants' Misconduct ........ 31
IV. Conclusion ........ 32

## I. INTRODUCTION

Pursuant to Fed. R. Civ. P. 65, Plaintiffs i2, Inc. and i2 Limited (collectively, "i2") request immediate injunctive relief against Defendants Palantir Technologies, Inc. ("Palantir"), SRS Enterprises, LLC ("SRS" or "SRS Enterprises"), Shyam Sankar, Dr. Asher Sinensky, and Nochur Sankar (collectively, the "Defendants") to: (1) immediately cease using all software applications and related hardware and documentation that defendant SRS fraudulently licensed from i2 (the "Enjoined Items")[1]; (2) return all Enjoined Items, but to forensically preserve an electronic copy of each of the Enjoined Items from their computer systems, servers or other storage devices in a secure location; and (3) certify to the Court the steps taken to cease using, return and preserve the Enjoined Items.[2]

Beginning in 2006 and continuing to the present, Defendants have been engaged in a clandestine and fraudulent scheme aimed at obtaining i2's proprietary and confidential technology for the benefit of i2's direct competitor, defendant Palantir. i2 recently discovered that the core technology it licensed to defendant SRS Enterprises for over four years was actually used by Palantir. i2 was unaware and without any reason to know that Defendants were using this entity to cloak their true identities and affiliations with Palantir. After discovering that defendant Asher Sinensky, a known Palantir employee, had attempted under the auspices of SRS to register for a July 1, 2010 online demonstration reserved exclusively for legitimate i2 licensees and authorized

[1] The Enjoined Items are comprised of the following: all versions and upgrades of Analyst's Notebook; all versions and upgrades of Analyst's Notebook SDK; all versions and upgrades of iBase; all versions and upgrades of iBase SSE Designer; all versions and upgrades of iBase SSE Designer with Extended Access Control module; all i2 issued dongles; and all media and documentation delivered with such products in the possession, custody or control of the Defendants.

[2] Concurrently with this Motion, i2 has also filed a Motion For Limited Expedited Discovery to obtain limited discovery from Defendants to determine the extent to which Palantir has developed any products or product features based on, or arising from, its misappropriation of i2's confidential and proprietary information.

potential customers, i2 commenced an investigation. The results of this investigation were alarming. The investigation revealed that a Palantir executive, Shyam Sankar, currently the Director of Forward Deployed Engineering, had initiated a scheme more than four years ago, using a Florida LLC called SRS Enterprises, to fraudulently obtain licenses to i2 products and services, including trade secrets and proprietary information, all for the ultimate benefit of Palantir.

As shown below, Defendants have willfully misappropriated i2's confidential and proprietary technology, and have used their unlawful access to such technology to advance Palantir's competing business at i2's expense. As a result, i2 has suffered, and continues to suffer, incalculable and irreparable harm, including infringement of its copyrights, misappropriation of its trade secrets, loss of customers, damage to its reputation, and loss of goodwill, for which it has no adequate remedies at law. In contrast, Defendants will suffer no harm if ordered to immediately return, delete, and cease the further use of i2's confidential and proprietary information obtained through unlawful means. Immediate injunctive relief is necessary to prevent continued irreparable harm to i2's business.

## II. STATEMENT OF FACTS

### A. The Competition Between i2 and Palantir

Since 1990, i2[3] has provided intelligence and investigation software solutions for defense, national security, law enforcement and commercial security sectors around the world. Declaration of John Parker ("Parker Decl.") ¶ 6. Thousands of organizations in nearly 150 countries rely on the i2 Intelligence-Led Operations Platform, which includes Analyst's Notebook®, iBase, and related technologies, to proactively deter, prevent, predict and disrupt criminal and terrorist

[3] i2 Inc. and i2 Limited, are wholly owned by i2 Holdings Limited, often referred to as "i2 Group." Parker Decl. ¶¶ 4, 5. i2 Limited is the UK-based arm of i2 Group. i2 Inc. serves as i2 Limited's United States distributor. Parker Decl. ¶ 5.

threats, to investigate crimes, and to provide security and investigative services. *Id*. These solutions enable public safety officers, analysts, managers, detectives and investigators to uncover hidden connections and understand and communicate complex data and security situations. *Id*.

Palantir is a software company that holds itself out as a developer and seller of data integration and analysis software intended for use by government organizations and private enterprises to collaborate and analyze large quantities of data. Parker Decl. ¶ 29. Palantir was founded in 2003 in San Francisco, California and is a direct competitor of i2. *See id*.

**B. i2's Products**

**The Analyst's Notebook®**: Licensed under strict terms of confidentiality and use, the Analyst's Notebook is an i2 software application that allows intelligence analysts to create documents called "Charts" that capture, visually represent, and communicate the analyst's work product. Parker Decl. ¶ 8. Using the Analyst's Notebook, the analyst can create a pictorial representation -- or Chart -- of key factual elements of an investigation, including personal identification, locations, organizations, weapons, relationships between such entities and other key facts that are input into the program, to render detailed timelines and other relational depictions. *Id*. The analytical tools and features within the Analyst's Notebook allow analysts to quickly identify connections, patterns and trends in complex data sets, and then build Charts depicting the significant elements within the data.. Parker Decl. ¶ 9. All users of the Analyst's Notebook must agree to confidentiality obligations and restrictions on use in i2's license agreements prior to installing and using the application. *See e.g.*, Declaration of Anthony Carty ("Carty Decl."), Exs. G and S at §§ 2.2, 2.3, 8, 9.1, 9.2. Once installed, access to and use of the software is strictly controlled with licensed hardware keys called "Dongles." Parker Decl. ¶ 19.

**The Analyst's Notebook SDK**: The Analyst's Notebook Software Development Kit (SDK) is a specialized software application used by licensed software developers to create

software that extends and modifies the functions of the Analyst's Notebook. Parker Decl. ¶ 11. The SDK is only licensed pursuant to strict confidentiality obligations and use restrictions. Parker Decl. ¶ 11; *see e.g.*, Carty Decl., Ex. J at §§ 2.2, 7, 8, 15.1. The SDK includes a kit of software tools, technical documentation, developer tutorials, code examples and detailed help files that provide an instruction set to skilled developers. Parker Decl. ¶ 11. With the Analyst's Notebook SDK, a developer can:

- Extend the functionality of the Analyst's Notebook application;
- Modify/override the existing functionality of the Analyst's Notebook application;
- Integrate the Analyst's Notebook with other application software such that the application works seamlessly with third party applications, in particular, to exchange data and analysis between multiple software environments; and
- Create entirely new software applications using components of the Analyst's Notebook application to provide customized functionality based on the visualization and algorithmic features of the Analyst's Notebook software.

All of these uses depend on the Analyst's Notebook software being installed as the base platform on a licensed user's systems. *Id.* ¶ 13. Therefore, to use any SDK-developed software extension of Analyst's Notebook, the end user must possess a license to an Analyst's Notebook, and therefore be a licensed customer of i2. *Id.*

**iBase**: iBase is a database software application created by i2 that allows intelligence analysts to capture and manage data in order to analyze, collaborate and disseminate actionable intelligence and insight. The application enables analysts to find hidden patterns and connections within the data, and to disseminate their findings through various means, including the iBase IntelliShare enterprise product (web-based iBase application) and Analyst's Notebook. Although iBase has many powerful analytical features in its own right, the Analyst's Notebook application has tight integration with iBase, allowing data, analysis and derived intelligence to be shared between the two software applications and users in those environments. Parker Decl. ¶ 16. Like

Analyst's Notebook and the SDK, i2 licenses iBase only pursuant to rigorous confidentiality obligations, use and restrictions, which the user must accept before installing and accessing the software. *See* Carty Decl., Ex. M at §§ 2.2, 2.3, 8, 9.1, 9.2. Use of the software is also controlled and restricted with a Dongle issued to the licensee. *See* Parker Decl. ¶ 19.

**The iBase SSE Designer with Extended Access Control (EAC) module:** The iBase SSE Designer provides simple-to-use tools to define database schema based on a customer's required data ontology (data model). The tools provided in iBase SSE Designer make iBase database creation and maintenance tasks simple enough that analysts can use the toolsets, rather than needing to rely on expert staff with Database Administrator or Software Developer skills. A license for the iBase application is included in the iBase SSE Designer suite. Also included in the Designer documentation is guidance and instructions for data modeling – which give insight into the technical 'make-up' of iBase databases. The iBase application and database software has extensive configuration provisions to support securing the data and access to the data within an iBase database. i2 additionally provide the Extended Access Control (EAC) module to customers that require very fine-grain control of security. Parker Decl. ¶ 17. Like the Analyst's Notebook and the SDK, i2 licenses iBase Designer only pursuant to rigorous confidentiality obligations, and use restrictions, which the user must accept before installing the software and obtaining access to it. *See, e.g.* Carty Decl., Ex. S at §§ 2.2, 2.3, 8, 9.1, 9.2. Use of the software is also controlled and restricted with a Dongle hardware key issued to the licensee. *See* Parker Decl. ¶ 19.

**The Semantic Type Library**: The Semantic Type Library ("STL") is a unique library of identifiers created by i2 that defines a set of common information types used in Intelligence Analysis. The i2 product range, including the Analyst's Notebook, SDK, iBase, and iBase SSE Designer, is specially designed to apply these identifiers to the data when input (by both manual and automatic means). The STL allows the i2 product to read the data and determine how to

interpret and process it, not as a stream of characters or numbers, but as the real world object (person, vehicle, phone number, etc.) that is described by the input data. The i2 STL defines entity types and link types, defining the categories of things and associations, and the properties of such objects (gender, dates of birth, manufacturer, model number etc.) that provide a means to identify and systematically process aspects of the objects that are input. These types are organized into a unique hierarchy determined by i2, so that the i2 software can systematically categorize similar or related concepts. The STL is constructed such that types near the top of the hierarchy are general while types below them are increasingly specialized derivatives. Parker Decl. ¶ 18.

**The Dongle.** Under its licenses, all i2 software products are accompanied by a small USB device called a "Dongle" that acts as a key to unlock the installed copy of the i2 software. Parker Decl. ¶ 19. Without a Dongle for the licensed software, a user cannot launch or access the software. *See id.* There are two types of Dongles: "local Dongles" and "network Dongles." *Id.* Local dongles plug into the USB port of a client computer, and the i2 software product licenses on that Dongle are available only locally to the user of that computer. *Id.* ¶ 19(a). Network Dongles plug into the USB port of any computer sitting on a computer network, and the i2 software product on that network Dongle is then available to any network user, up to a pre-agreed maximum number of concurrent users. *Id.* ¶ 19(b).

### C. Defendants Shyam Sankar and Nochur Sankar Contact i2 Under the Guise of SRS Enterprises

Defendant Shyam Sankar joined the management team of Palantir as Director of Business Development in March 2006. Parker Decl. ¶ 33, Ex. I. On or about March 20, 2006, Shyam Sankar contacted i2's offices in McLean, Virginia, seeking information about i2's products. Sankar did not disclose his affiliation with Palantir, but represented that he was with SRS Enterprises. Carty Decl. ¶ 4, Ex. A. Unknown to i2 at the time, SRS was formed by Shyam Sankar's father, Nochur Sankar, and had three managing members at that time: Nochur Sankar (a

pharmacist), Shyam Sankar, and his mother Girija Sankar (a nurse). Parker Decl. ¶ 32. Based on i2's recent investigation, it appears that SRS does not have ongoing business activities of any kind, and certainly none that relate to legitimate uses of i2's products. In response to Shyam Sankar's request for information ostensibly on behalf of SRS, i2 sent a package of informational materials on its products and services. Carty Decl. ¶ 5, Ex. B.

On or about April 12, 2006, Shyam Sankar, again purporting to be from SRS, placed a request to i2, stating that he was "Ready to purchase [i2 software] for my commercial Fraud Investigations" and specified Nochur Sankar as the new contact person for SRS, as well as an address in Florida. Carty Decl. ¶ 6, Ex. C. Although Shyam Sankar listed Nochur Sankar as the contact person, the contact phone number that he provided is, as i2 recently learned, the mobile number on Shyam Sankar's Palantir business card. Carty Decl. ¶ 6, Ex. C; Parker Decl. ¶ 33, Ex. H.

### D. Defendants Misappropriate i2's Technology by Fraudulently Acquiring Licenses to i2 Technology

On or about April 13, 2006, i2, having no reason to know of SRS's connections to Palantir, shipped a license, dongle, documentation and software for Analyst's Notebook to SRS in response to an order ostensibly placed by Nochur Sankar. Carty Decl. ¶¶ 6-10. The Analyst's Notebook was licensed to SRS under strict terms of confidentiality that prohibit disclosure of specifically identified trade secrets within the software, as well as restrictions on uses of the software that appear in all of i2's standard end use product license agreements. Carty Decl. ¶ 10, Ex. G at §§ 2.2, 2.3, 8, 9.1, 9.2.

On or about June 6, 2006, SRS, ostensibly through Nochur Sankar, entered into a separate license agreement for the Analyst's Notebook Software Developer's Kit (SDK) ("2006 License

Agreement").[4] Carty Decl. ¶ 13. The 2006 License Agreement contained detailed restrictions on the use and distribution of i2's proprietary technology to ensure that the technology was not made available to third parties, particularly i2's competitors. For example, the agreement provided: (1) the licensee could not use the Product to create a software program designed for substantially the same purpose(s) as or otherwise substantially similar to any i2 Products (Carty Decl., Ex. J at § 2.2.3); (2) the licensee was required to maintain i2's proprietary information in strict confidence and not disclose it to a third party without i2's written approval (Carty Decl., Ex. J at § 8.1). The licensee also agreed not to decompile, disassemble, or reverse engineer i2 software, and required "Authorized Users" (one employee of the licensee who has a need to use the Product) to agree to the same. Carty Decl., Ex. J at § 7.5. The licensee also agreed not to give any known competitor of i2 access to the proprietary information. Carty Decl., Ex. J at § 8.1.

Unbeknownst to i2, at the time SRS ordered the Analyst's Notebook and SDK and submitted to the licensing terms, Defendants had no intention of keeping the proprietary information confidential or protecting it from disclosure to i2's competitor. This is beyond dispute because the party who surreptitiously solicited this purchase, Shyam Sankar, was also a management-level employee at Palantir.

Continuing this scheme in 2007, SRS, again ostensibly through Nochur Sankar, purchased a license for i2's iBase SSE Designer software with Extended Access Control module (and one year of support). Carty Decl. ¶ 18. Again, the address given for the purchase was the registered address for SRS and the phone number given was the mobile phone number of Shyam Sankar - a

---

[4] During early communications with i2, the representatives for SRS (ostensibly Nochur or Shyam Sankar) began using the name "SAS" for the entity licensee. The SAS name was written by Nochur or Shyam Sankar on the original purchase order in April 2006 for the Analyst's Notebook and then on the purchase order for the SDK and the related 2006 License Agreement. SAS appears in i2's Customer Relationship Management (CRM) system. *See* Carty Decl. ¶ 13; Parker Decl. ¶¶ 30, 42.

fact that i2 recently ascertained. *Id*. The license agreements for these additional i2 software products also contained rigorous confidentiality obligations and restrictions on use. Carty Decl. ¶ 22, Ex. S at §§ 2.2, 2.3, 8, 9.1, 9.2.[5]

In August 2007, i2 received an email from the ssankar@gmail.com address, requesting that i2 put all of the software licensed by SRS onto a single *network* Dongle, presumably so that the i2 products could be accessed by multiple users through a network. Carty Decl. ¶ 19. The email closed with "Thanks, Nochur." *Id.* This action is particularly troubling: in hindsight, SRS, a company whose activities, if any, are conducted from a residence, does not appear to have any legitimate use for i2's products, let alone for use of such products on a computer network. Palantir, however, is a company that certainly would have a network, and the ability to run i2's programs on a network would make its illegitimate use of i2's products more effective.

In October 2007, i2 was contacted again by Nochur Sankar on behalf of SAS Enterprises. This time, Nochur Sankar sought to purchase a license for i2's newest version of the Analyst's Notebook, version 7, as well as a year of support. Again, the address given for this purchase was 2336 Rye Grass Lane, Oviedo, Florida and the phone number was a number that i2 recently determined is the cell phone number of Shyam Sankar. Carty Decl. ¶ 21.

In 2008, Defendants again conspired under the guise of SRS to purchase two additional licenses for i2's Analyst's Notebook 7 and accompanying support. Carty Decl. ¶ 24. Again, Defendants purchased the licenses on behalf of and for the benefit of Palantir and never intended to comply with the terms of the license agreements. *Id.* Throughout the period since 2006, Defendants conspired under the guise of SRS to purchase continued annual support for the various

[5] The 2006 license for Analyst's Notebook, version 6, contains substantially the same provisions. Carty Decl., Ex. G at §§ 2.2, 2.3, 8, 9.1, 9.2.

software products previously licensed.[6] Carty Decl. ¶ 25. The purchase of this support gave the Defendants continued access to i2 software updates, new releases and information concerning new software features. *Id.* Because they purchased support, the Defendants were automatically provided with the newest version of the Analyst's Notebook, version 8.5.1 and iBase 8.1.1. *Id.*

In June 2010, defendant Sinensky registered online for a July 1, 2010 i2 Webinar under the name "SAS Enterprises." Parker Decl. ¶ 40. However, in reviewing the Webinar registration forms, i2 recognized the requestor as Dr. Asher Sinensky of Palantir (asherks@gmail.com). *Id.* Sinensky has been a Forward Deployed Engineer for Palantir since 2005, and is a very outspoken antagonist to i2 in the market. Parker Decl. ¶ 35. The registration from Dr. Sinensky's e-mail account listed the mobile telephone number connected to Shyam Sankar. *Id.* at ¶ 41. Having identified the connection between Shyam Sankar, Palantir and Sinensky, i2 immediately commenced an investigation that uncovered this four-year-long scheme of corporate espionage to defraud i2 for the benefit of Palantir. *Id.* at ¶ 42. It also revealed Shyam Sankar had registered for, and attended, an i2 User Conference on or about May 2006. Parker Decl. ¶ 43. Although Shyam Sankar had been employed at Palantir in a management role for several months , he registered and attended the conference under the company name "Xoom," his former employer, and a company that does not compete with i2. *Id.* Notably, when Shyam Sankar registered for the 2006 conference, he provided his home address and his mobile number, rather than contact information for Xoom or Palantir. *Id.*

### E. Palantir's Unlawful Use of i2's Products and Trade Secrets

i2 has good cause to believe that Palantir unlawfully obtained i2's proprietary products and source code: (1) to develop or otherwise enhance, improve, or promote the features of a Palantir

---

[6] The confidentiality provisions and other use restrictions in the 2009 version of the licenses for Analyst's Notebook, iBase, and iBase SSE Designer are substantially the same as those in the 2006 and 2007 agreements for such products. *See* Carty Decl., Ex. V at §§ 2.2, 2.3, 8, 9.1, 9.2.

"importer" application that extracts data from the Analyst Notebook files (the "Analyst's Notebook data importer"); and (2) to develop or otherwise enhance, improve or promote a Palantir software utility that extracts data out of the i2 iBase database that Palantir calls the "iBaseCrawl" ("iBaseCrawl"). These Palantir products – which i2 contends were developed by illegally using i2's proprietary software, computer code and related tools – enable Palantir to readily import data residing in files created by i2's software products, making it an easy transition for i2 customers to switch to Palantir. Palantir advertises and promotes this capability as a selling point when it attempts to solicit i2 customers. Parker Decl. ¶ 51.

There can be no doubt that Palantir obtained access to and possession of i2 products and trade secrets through Sankar and SRS. *See* Parker Decl. ¶ 54 (regarding Palantir's use of i2's icons). For example, Palantir has created two instructional videos demonstrating how to extract Analyst's Notebook files[7] from a launched Analyst's Notebook application and import into a Palantir application. Parker Decl. ¶¶ 48-49. The first video displays a launched Analyst's Notebook. Parker Decl. ¶ 48. The instructor states that "in this demonstration, we are going to show how the direct import of Analyst's Notebook files has been integrated into the Palantir data importer" and adds that "[i]n this way, it's possible for an organization to include their old Analyst's Notebook files into their enterprise datastore." *Id*. The second video also displays a Chart on a launched Analyst's Notebook application. Parker Decl. ¶ 49. The instructor saves the Chart as an .anb file and then brings the file into Palantir "through a standard data import tool." *See id.* The Palantir Government application's "Help and Support" section on Palantir's website contains detailed instructions on how to open an Analyst's Notebook chart file from an iBase database and extract the data into the Palantir Government application. Parker Decl. ¶ 47. Notably, the instructions state that "[t]o import ANB [Analyst's Notebook] files into a Workspace

---

[7] Analyst Notebook files are identified by the use of the ".anb" file extension. Parker Decl. ¶ 9.

Investigation [Palantir application], ANB must be installed on the same machine as the Workspace client." *Id*. Because the Analyst's Notebook must be installed on the same machine as Palantir's application, there is no plausible conclusion except that Palantir used i2's Analyst's Notebook at least to verify the claimed functionality, and likely used it in developing the application itself. *Id.*

To the extent possible, without the benefit of discovery, i2 has investigated Palantir's likely uses of i2's products, and has determined that Palantir could not have developed the Analyst's Notebook data importer functionality or iBaseCrawl utility without using i2's software and underlying code. Parker Decl. ¶ 50. Developing an application that has the ability to import files created using the Analyst's Notebook would be virtually impossible without access to the Analyst's Notebook and the SDK. *Id.* at ¶ 53. Palantir has never legitimately obtained a license to either product. In light of the facts, there is no reasonable explanation except that Palantir obtained and used i2's products, by way of the defendants' fraudulent acts.[8] *Id.* at ¶¶ 50-54.

## III. ARGUMENT

### A. Legal Standard

To obtain a preliminary injunction, a plaintiff must establish four factors: (1) "that he is likely to succeed on the merits"; (2) "that he is likely to suffer irreparable harm in the absence of preliminary relief"; (3) "that the balance of equities tips in his favor"; and (4) "that an injunction is in the public interest." *Winter v. Natural Res. Def. Council*, 129 S. Ct. 365, 374 (2008); *see also Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 347 (4th Cir. 2009) (standard articulated in *Winter* governs issuance of preliminary injunction in Fourth Circuit), *judgment vacated on other grounds* by 130 S. Ct. 2371 (2010).

[8] To determine the full extent of Palantir's wrongful conduct, i2 needs access to Palantir's source code and the other targeted discovery that i2 seeks in its concurrently filed motion for expedited discovery.

**B. i2 Is Likely to Succeed on the Merits for Each Claim on Which It Seeks Injunctive Relief**

i2 seeks immediate injunctive relief on the basis of its claims for misappropriation of trade secrets (Claim III), breach of contract (license agreement) (Claim II), and copyright infringement (Claim IV). While i2 is likely to succeed against each defendant on each claim, it need only show likelihood of success on one claim to be entitled to preliminary injunctive relief. *See McNeil-PPC, Inc. v. Granutec, Inc.*, 919 F. Supp. 198, 201 (E.D.N.C. 1995) ("Where multiple causes of action are alleged, plaintiff need only show likelihood of success on one claim to justify injunctive relief.") (internal citation omitted).

**i. Misappropriation of Trade Secrets**

Under the Virginia Uniform Trade Secrets Act (VUTSA), acquisition of a trade secret[9] of another by a person who knows or has reason to know that the trade secret was acquired by improper means[10] constitutes misappropriation. *See* Va. Code Ann. § 59.1-336. In addition, misappropriation is defined as disclosure or use of a trade secret of another without express or implied consent by a person who: (a) used improper means to acquire knowledge of the trade secret; or (b) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was (1) derived from or through a person who had utilized improper means to acquire it; (2) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its

[9] A "trade secret" is defined as "information, including but not limited to, a formula, pattern, compilation, program, device, method, technique, or process, that: (1) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Va. Code Ann. § 59.1-336.

[10] Under the VUTSA, improper means "includes theft, bribery, misrepresentation, use of a computer or computer network without authority, breach of a duty or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." Va. Code Ann. § 59.1-336. This list is non-exhaustive. *See Microstrategy, Inc. v. Bus. Objects, S.A.*, 331 F. Supp. 2d 396, 416 (E.D. Va. 2004).

use; (3) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or (4) acquired by accident or mistake. *Id*.

**a. i2's Trade Secrets**

The trade secrets at issue here include, but are not limited to: the Analyst's Notebook SDK, including the "Software, API, Sample Code, the Documentation, *Analysts Notebook*, Dongle and the Media for *Analyst's Notebook Development Kit*" all of which are explicitly defined as i2's trade secrets in the 2006 License Agreement; as well as the specifically identified Semantic Type Library ("STL") included in all versions of the Analyst's Notebook, iBase, and iBase SSE Designer software license agreements. Carty Decl., Ex. J **(**2006 License Agreement) at §§ 1.22, 1.28, and 7.2 and Exs. G, M, S and V (2006, 2007, and 2009 licenses for ANB, iBase, and iBase SSE Designer) §§ 2.10, 2.11, 9; Parker Decl. ¶ 26-28 (describing SDK and STL).

The trade secret information concerning the SDK and i2's other products identified above is undoubtedly entitled to protection under the VUTSA. "Information that would economically benefit competitors, were it to become known to them, satisfies the standard if that information is safeguarded from disclosure in a manner that is reasonable under the circumstances." *Physicians Interactive v. Lathian Sys. Inc.*, No. CA 03-1193-A, 2003 WL 23018270, at *8 (E.D. Va. Dec. 5, 2003) (citing *Dionne v. Southeast Foam Converting & Packaging, Inc.*, 397 S.E. 2d 110, 113-14 (Va. 1990)). The trade secrets at issue here derive their economic value from their secrecy and are precisely the type of information that i2 takes caution to keep from competitors. For example, when an i2 competitor like Palantir obtains access to the i2 software, such information would certainly be economically beneficial to Palantir, because it would allow Palantir to study and use i2 products to advance its own business interests against those of i2. *See* Parker Decl. ¶¶ 26-27. The same is true of the STL that is provided to licensees with the Analyst's Notebook, iBase and

iBase SSE Designer products. *See id*. at ¶ 28. The value of such trade secrets to i2's competitors is clearly demonstrated by the lengths that defendants went to in obtaining them.

In addition, i2 has taken substantial efforts to maintain the secrecy of the trade secrets at issue. All of i2's license agreements contain detailed restrictions on the use and distribution of i2's software – to ensure that i2's proprietary information is provided only to legitimate licensees, and not to third parties – particularly competitors. *See e.g.*, Carty Decl., Ex. J at §§ 2.2, 7, 8, 15.1 and Exs. G, M, S, and V at §§ 2.2, 2.3, 8, 9.1, 9.2. In addition, only legitimate licensees receive a "Dongle" – the hardware authorization key that enables licensees to access and use the licensed software once it is installed. *See* Parker Decl. ¶¶ 19, 25. Finally, all i2 employees are required to sign strict non-disclosure agreements, prohibiting them from disclosing i2 trade secrets to anyone outside of the company Parker Decl. ¶ 25.

Here, SRS expressly acknowledged in the June 2006 License Agreement that the SDK "contains substantial Trade Secrets of i2 and its licensors, which have been entrusted to Licensee for use only as expressly authorized under this Agreement," and that "such Trade Secrets (i) derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from their disclosure or use, and (ii) are the subject of efforts of i2 and its licensors that are reasonable under the circumstances to maintain their secrecy." Carty Decl., Ex. J at § 7.2.[11]

---

[11] The fact that SRS obtained licenses (fraudulently) to i2's proprietary software does not accord the software any less trade secret protection. As the Virginia Supreme Court held in *Dionne v. Southeast Foam Converting & Packaging, Inc.*, "[t]he secrecy need not be absolute; the owner of a trade secret may, without losing protection, disclose it to a licensee, an employee, or a stranger, if the disclosure is made in confidence, express or implied." 397 S.E. 2d at 113.

In addition, as to each of the versions of Analyst's Notebook, iBase, and iBase SSE Designer, SRS agreed and acknowledged that the products contained the specifically identified STL i2 trade secrets. *See* Carty Decl., Exs. G, M, S and V at §§ 2.10, 2.11, 9.

**b. SRS Enterprises, Shyam Sankar, and Nochur Sankar Misappropriated i2's Trade Secrets**

SRS Enterprises and managing members Shyam Sankar and Nochur Sankar (the "SRS Defendants") misappropriated i2's trade secrets by: (1) acquiring i2's trade secrets with knowledge or reason to know that the trade secret was acquired by improper means; (2) using or disclosing the trade secrets without i2's express or implied consent and using improper means to acquire knowledge of the trade secrets; and (3) using or disclosing the trade secrets without i2's express or implied consent, when they knew or had reason to know that their knowledge of the trade secret was "[a]cquired under circumstances giving rise to a duty to maintain its secrecy or limit its use." *See* Va. Code Ann. § 59.1-336.

As an agent of Palantir, but holding himself out as a person acting on behalf of SRS, Shyam Sankar made material misrepresentations to i2, including the claim that SRS was purchasing i2 software for its "commercial Fraud Investigations."[12] i2's investigation has now revealed that SRS has never had any business that would involve using i2's technology for "commercial Fraud Investigations." *See* Parker Decl. ¶¶ 31-32.

In the course of obtaining i2 trade secrets, Defendants acted with intent to mislead i2. Defendants misrepresented to i2 that they were from SRS, a purportedly legitimate licensee, and that they intended to use the i2 products for "commercial Fraud Investigations." Defendants made

---

[12] In addition to misrepresentation, this conduct also constitutes espionage, another "improper mean" to acquire information under the VUTSA. As this Court has stated: "[e]spionage is adequately defined as the use of spies to obtain information about the plans or activities of a competing company. The term spy need not carry any cloak and dagger connotations. Simply put, a spy is someone who is employed to convey the confidential information of one company to another." *See Microstrategy*, 331 F. Supp. 2d at 417.

the representations with actual knowledge that such representations were false. Indeed, Defendants *had* to make such misrepresentations in order to pose as a legitimate licensee to induce i2 to enter into license agreements. *See Stone Castle Fin., Inc. v. Friedman, Billings, Ramsey & Co.*, 191 F. Supp. 2d 652, 663 (E.D. Va. 2002) (fraud pled where plaintiff gave its confidential information in reliance on defendant's assurances not to share the information); *Godlewski v. Affiliated Computer Servs., Inc.*, 210 F.R.D. 568, 571 (E.D. Va. 2002) (fraudulent inducement pled where defendant never intended to honor promises made to lure her to enter into contract).

The 2006 License Agreement provides that "**[u]nder no circumstances may the Receiving Party give any known competitor of the Owning Party access to the Proprietary Information of the Owning Party** . . . ." Carty Decl., Ex. J at § 8.1. As the Fourth Circuit has stated, "fraud can be found in a breach of contract if the defendant did not intend to perform at the time of contracting." *Flip Mortg. Corp. v. McElhone*, 841 F.2d 531, 537 (4th Cir. 1988). Defendants' intent to supply the confidential and proprietary information to Palantir was in direct violation of the promises it made through the licensing agreements.[13]

In addition, the SRS Defendants knew or had reason to know that their knowledge of the trade secrets was "[a]cquired under circumstances giving rise to a duty to maintain its secrecy or limit its use." *See* Va. Code Ann. § 59.1-336. Each license agreement entered into with i2 contained a provision stating that the licensee was to maintain the confidentiality of the trade secrets at issue and was not permitted to disclose them without i2's prior written approval. *See, e.g.*, Carty Decl., Ex. J at § 8.1 and Exs. G, M, S, and V at § 9.1. Of course, the SRS Defendants

---

[13] This Court and others within the Circuit have also demonstrated a willingness to grant temporary restraining orders and preliminary injunctions in cases involving fraud. *See Vertex Telecom, Inc. v. XO Commc'ns, Inc.*, No. 1:06cv1209 (JCC), 2006 WL 3746142, at *1 (E.D. Va. Dec. 14, 2006) (noting that the Court earlier granted plaintiff's motion for injunctive relief in case involving fraud in a commercial transaction); *AT & T Corp. v. Nudell*, No. RDB-07-1603 (D. Md. June 19, 2007).

never sought permission from i2 to disclose the trade secrets to Palantir, or to use them for Palantir's benefit.

**c. Palantir, Shyam Sankar, and Asher Sinensky Misappropriated i2's Trade Secrets**

Palantir, Shyam Sankar, and Asher Sinensky (the "Palantir Defendants") also misappropriated the trade secrets at issue in at least four distinct ways. First, Palantir acquired and continues to possess i2's trade secrets with knowledge or reason to know that they had been acquired by improper means at least in part through the actions of Shyam Sankar. Second, Palantir, Shyam Sankar and Sinensky used the trade secrets without i2's express or implied consent after using improper means to acquire them. Third, they used the trade secrets without i2's express or implied consent, and, at the time of use, knew or had reason to know that their knowledge of the trade secret was "derived from or through a person who had utilized improper means to acquire it." Va. Code Ann. § 59.1-336. Fourth, they used the trade secrets without i2's express or implied consent, and, at the time of use, knew or had reason to know that their knowledge of the trade secret was "[d]erived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use." *Id*.

There can be no question that the Palantir Defendants acquired and used i2's trade secrets knowing that they were acquired by improper means. Palantir is a direct competitor of i2, and Shyam Sankar was at all relevant times a director or manager for Palantir, and a manager of SRS, the vehicle for acquiring the trade secrets. Parker Decl. ¶¶ 29, 33. Likewise for Sinensky. Parker Decl. ¶ 35. Palantir knew or should have known that it acquired access i2's trade secrets as a result of the improper means employed by Shyam Sankar, SRS and Nochur Sankar.[14]

---

[14] In *Microstrategy*, the court disregarded defendants' claims that they came across confidential information accidentally, when the facts show that the confidential information was actively solicited. In such cases, the court stated that "mere acquisition, even without disclosure or use, would be misappropriation." *Microstrategy*, 331 F. Supp. 2d at 417. Applicable in this case, any

In a similar case, *Datatel, Inc. v. Rose & Tuck, LLC,* software developer Datatel alleged that software training company Rose & Tuck (R&T) had taken confidential trade secrets contained in Datatel software documentation and training materials, in violation of the VUTSA. *See* No. 05-495, 2005 WL 1668020, at *1 (E.D. Va. June 17, 2005). As evidence that R&T misappropriated its trade secrets, Datatel alleged that R&T had bid on a contract, promising sharing confidential information with the potential client without a license from Datatel. *Id.* The court granted Datatel's preliminary injunction and then rejected R&T's motion to dissolve the injunction. *Id.* The court found that R&T obtained the information through improper means based on statements R&T made in its bid that it would supplement the client's Datatel documentation with its own. *Id.* at *8. The court reasoned that "R&T would not have been able to prepare its own 'supplementation' documentation… without information obtained from an employee or licensee of Datatel," and since Datatel only provided this type of information to its employees or licensees under obligations of confidentiality, the court concluded that R&T must have acquired the information through improper means. *Id; see also MicroStrategy*, 331 F. Supp. 2d at 422 (finding misappropriation where document could only have been obtained from plaintiff's employee in breach of employment agreement.). The reasoning in *Datatel* and *MicroStrategy* apply here.

Furthermore, Palantir's own publications establish that Defendants possess and use the Analyst's Notebook and iBase products, both of which contain the trade secret STL publicly available documentation of the utility. Two Palantir demonstration videos show Palantir applications extracting a Chart (an .anb file) from a launched Analyst's Notebook application and importing the data into the Palantir application. Parker Decl. ¶¶ 48-49. Palantir's website also

---

attempt by Palantir to argue ignorance of its employees' malfeasance or that it obtained i2's trade secrets by chance must be disregarded. The facts are clear that Palantir actively worked toward gaining access to i2's software, using SRS Enterprises and Palantir employees as its instruments. Thus, even absent proof of the Palantir Defendants' use of the trade secrets (though here, there is plenty), i2 is likely to succeed on its misappropriation claim.

contains instructions on how to extract the contents of an iBase database and import it into a Palantir application. Parker Decl. ¶ 47.[15]

Through Shyam Sankar, Palantir and Sinensky have access to all of the other i2 products that SRS licensed from i2. Such access, in light of Palantir's indisputable possession and use of the Analyst's Notebook in operating the Analyst's Notebook data importer and iBase in operating iBaseCrawl, gives rise to a grave threat of misappropriation meriting injunctive relief. Va. Code Ann. § 59.1-337(a). In addition, the evidence strongly suggests that Palantir used the SDK, along with the STL included in the Analyst's Notebook, iBase, and iBase SSE Designer, when developing its Analyst's Notebook data importer and iBaseCrawl. Parker Decl. ¶ 50. The defendants should be dispossessed of the means to make further use of any of the i2 trade secrets that SRS has received through its fraudulent licenses.

**ii. Breach of Contract**

i2 is also likely to prevail on its breach of contract claim against Defendant SRS.[16] To succeed on a breach of contract claim, i2 must show: (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) damage to the plaintiff caused by the breach. *See Filak v. George*, 594 S.E. 2 d 610, 614 (Va. 2004).

SRS has materially breached several legally enforceable obligations in the June 2006 License Agreement. As shown above, the agreements included strict use limitations, and SRS

---

[15] In addition to the fraudulent actions taken to obtain the i2 trade secrets under the auspices of SRS, the evidence shows that both Shyam Sankar and Dr. Asher Sinensky enrolled in i2 webinars under false pretenses, again using the "SAS" moniker and its principal Nochur Sankar, but requesting access through their personal gmail accounts and Shyam Sankar's mobile phone number. Parker Decl. ¶ 40. The court can reasonably infer that attempts to attend user webinars present a strong likelihood that Sinensky and Sankar were both using i2's trade secrets.

[16] Under Fed. R. Civ. P. 65(d)(2), an injunction order binds the parties, their agents and others acting in concert. Here any injunction based on SRS's breach of the license agreements should reach, at a minimum, SRS members Shyam Sankar and Nochur Sankar.

breached the agreements by, among other things, transferring and disclosing i2's proprietary software and information, including the trade secrets, to Palantir. Carty Decl., Ex. J at §§ 2.2 *et seq.*, 7 *et seq.*, and 8.1; *See Bowe Bell & Howell Co. v. Harris*, 145 F. App'x 401, 404 (4th Cir. 2005) (copying plaintiff's source code from licensee onto defendant's computer and using plaintiff's software to service customers likely violated license agreement). Likewise, SRS also breached each of the confidentiality and use restrictions in the license agreements covering the Analyst's Notebook, iBase, and iBase SSE Designer. *See* Carty Decl., Exs. G, M, S and V at §§ 2.2, 2.3, 8, 9.1, 9.2.

**iii. Copyright Infringement**

To assert a prima facie claim for copyright infringement, i2 must establish: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publ'ns., Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991); *Lyons P'ship, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 801 (4th Cir. 2001) (same).

A copyright registration certificate constitutes *prima facie* evidence of validity of the copyright and of the facts stated in the certificate. 17 U.S.C. § 410(c); *Serv. & Training, Inc. v. Data Gen. Corp.*, 963 F.2d 680, 688 (4th Cir. 1992); *Palmetto Builders and Designers, Inc. v. Unireal, Inc.*, 342 F. Supp. 2d 468, 472 (D.S.C. 2004). i2 Limited is the owner of copyright registrations for Analyst's Notebook 7.0 (Reg. No. TXu 1-578-426), Analyst's Notebook 8.0 (Reg. No. TXu 1-657-489), and iBase 5.0 (Reg. No. TXu 1-578-423). Parker Decl. ¶¶ 20-24, Exs. A, B, and C. It is undisputed that the copyrights cover each products' source code (code in human-readable form) and object code (code in computer-readable form). *See Lotus Dev. Corp. v. Paperback Software Int'l*, 740 F. Supp. 37, 45 (D. Mass. 1990) (both source code and object code are copyrightable if original). Thus, the copyrights at issue are valid and i2 is the sole owner.

The second prong of copyright infringement consists of two sub-elements: (1) whether the defendant did in fact copy; and (2) whether the things copied are original to merit copyright protection. *See Custom Dynamics, LLC v. Radiantz LED Lighting, Inc.*, 535 F. Supp. 2d 542, 551 (E.D.N.C. 2008) (citing 4 *Nimmer on Copyright* § 13.01[B]). To show copying, a plaintiff must either (1) proffer direct evidence of copying; or (2) show that the defendant had access to the copyrighted works and the defendant's infringing product is substantially similar to the copyrighted works. *See Palmetto,* 342 F. Supp. 2d at 472. Here, there is compelling evidence that the defendants copied the entire Analyst's Notebook and iBase software programs onto Palantir's computer systems.

To establish copying, i2 needs only to demonstrate that Palantir made one unlawful copy of the software. In *Advanced Computer Services of Michigan, Inc. v. MAI Systems Corp.* ("*MAI Systems*"), this Court held that the act of transferring a copyrighted software program from a computer's hard drive or permanent memory to its random access memory ("RAM")—i.e., "loading" the software—amounts to the making of a "copy" under the Copyright Act[17], and therefore constitutes infringement. *See* 845 F. Supp. 356, 363-64 (E.D. Va. 1994). In *MAI Systems*, the plaintiffs "use[d] MAI's copyrighted operating system software in their machines without having obtained a license or any other permission from MAI." *Id.* at 361. The software was used in part to help plaintiffs generate their own software. *Id.* The court reasoned that where "a copyrighted program is loaded into RAM and maintained there for minutes or longer, the RAM representation of the program is sufficiently 'fixed' to constitute a 'copy' under the Act." *Id.* at 363. Thus, the court concluded that loading into RAM is copyright infringement. *Id.* at 367.

[17] Under the Copyright Act, "copies" are defined as "material objects, other than phonorecords, in which a work is fixed by any method now known or later developed, and from which the work can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." 17 U.S.C. § 101.

Other courts, including the Fourth Circuit, have held the same. *See e.g.*, *Quantum Sys. Integrators, Inc. v. Sprint Nextel Corp.*, 338 F. App'x 329, 336-37 (4th Cir. 2009); *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 519 (9th Cir. 1993).

There can be no doubt that Palantir loaded i2's copyright protected software onto a computer. As described above, two demonstration videos on Palantir's website show Palantir applications ingesting data from an Analyst's Notebook application. Parker Decl. ¶¶ 48-49. Palantir's website also contains instructions on how to extract data from an i2 iBase database and import it into a Palantir application. For imports from the Analyst's Notebook application, Palantir's website instructions expressly indicate that an Analyst's Notebook must be installed on the same machine. *Id.* at ¶ 47. These demonstrations alone establish Palantir's unlawful copying.[18] *Id.* at ¶ 50.

In addition, SRS and managing members Nochur Sankar and Shyam Sankar provided an unauthorized party with the copyrighted technology beyond the scope of its licenses. Despite agreeing that "[u]nder no circumstances may the Receiving Party give any known competitor of [i2] access to the Proprietary Information," they gave Palantir unfettered access to the copyrighted technology. Carty Decl., Ex. J at § 8.1; *see also* Carty Decl., Ex. S at §§ 2.2 and 2.3. Courts consistently find copyright infringement when a licensee distributes a copyrighted work beyond the scope of the license agreement. *See, e.g.*, *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 535 (4th Cir. 2003) (defendant exceeded scope of limited license by distributing middleware

[18] Further, the portion of the software code that Defendants have copied is original and merits copyright protection. The software code in the copyrighted works was independently created by i2 and exceeds the requisite "minimal degree of creativity." *Feist*, 499 U.S. at 345 ("Original, as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity. To be sure, the requisite level of creativity is extremely low; even a slight amount will suffice. The vast majority of works make the grade quite easily, as they possess some creative spark, 'no matter how crude, humble or obvious' it might be.") (internal citations omitted).

containing plaintiff's copyrighted source code); *see also McRoberts Software, Inc. v. Media 100, Inc.*, 329 F.3d 557, 565 (7th Cir. 2003). Thus, i2 is likely to succeed against each Defendant on its copyright infringement claims.

**C. i2 Will Continue to Suffer Irreparable Harm if Defendants Are Permitted to Continue Possessing and Using i2's Proprietary Technology**

The VUTSA expressly provides that "[a]ctual or threatened misappropriation may be enjoined." *See* Va. Code Ann. § 59.1-337(A). In the *Datatel* case described in Part III(B), the court found that plaintiff Datatel had shown that, without the injunction, it would continue to face irreparable injury from defendant R&T's misappropriation. *Datatel*, 2005 WL 1668020, at *6. The court reasoned that "[p]laintiff lacks control over R&T's use and interpretation of Datatel's materials, and R&T will likely associate Datatel's software and related materials with future R&T training services." *Id.* The court also found that is the damages to be difficult to calculate with precision: "If Datatel's trade secrets are disclosed, divulged, or disseminated to third parties, Datatel would face a continual loss of its intellectual property." *Id.* at *8. Thus, the court held injunctive relief was required. *Id.* at *6.

Equally here, without an injunction, i2 is deprived of its exclusive rights to its trade secrets. *See* Parker Decl. ¶ 57. Palantir's mere possession of i2's trade secrets is unlawful and threatens irreparable harm to i2. Palantir is likely to continue using i2's trade secrets and has no incentive to stop doing so, absent injunctive relief. *See* Parker Decl. ¶ 58. Thus, like Datatel, i2 has been and continues to be irreparably harmed by Defendants' misappropriation and cannot quantify the damages caused.

Similar to the irreparable harm that results from misappropriation of trade secrets, the Fourth Circuit has recognized that "[i]rreparable injury often derives from the nature of copyright violations, which deprive the copyright holder of intangible exclusive rights" and "[d]amages at law will not remedy to continuing existence of [plaintiff's] design in the [defendant's product]."

*Christopher Phelps & Assocs., LLC v. Galloway*, 492 F.3d 532, 544 (4th Cir. 2007).[19] This Court also noted in the recent case *Splitfish AG v. Bannco Corp.* that "allowing defendants to continue to distribute plaintiffs' copyrighted work—particularly when the record reflects that plaintiffs have not licensed the use of the copyrighted code in any third party's devices—would significantly diminish the intangible value of the work to plaintiffs in a manner that could not be cured by damages alone." No. 1:10cv297, 2010 WL 2928510, at *6 (E.D. Va. July 22, 2010). In *VMC Satellite, Inc. v. Direct Cable, Inc.*, this Court found that the defendant's copyright infringement, "in violation of [plaintiff's] exclusive rights," "proximately caused and will continue to cause [plaintiff] substantial injury, including loss of customers and dilution of its goodwill." No. 04-818, 2005 WL 937844, at *2 (E.D. Va. Mar. 7, 2005). The court also held that the plaintiff had no adequate remedy at law because (1) "[plaintiff]'s copyrights are unique and valuable property which have no readily determinable market value" and (2) "the infringement by [defendant]'s wrongful conduct, and the damages resulting to [plaintiff] therefrom is continuing." *Id.* Thus, the court concluded that defendant's copyright infringement caused plaintiff irreparable injury, warranting injunctive relief. *Id.* Here, i2's copyrights are unique and valuably property. Parker Decl. ¶ 57. Defendants have created unauthorized copies of i2's copyrighted works, have used them in competitive activities against i2, and have used them beyond the scope of the license agreements—in effect, providing Palantir the benefits of i2's copyrighted works at i2's expense. Absent injunctive relief, Palantir's unlawful conduct will continue to irreparably harm i2.

---

[19] The court also commented that "while the calculation of future damages and profits for each future sale might be possible, any such effort would entail a substantial amount of speculation and guesswork that renders the effort difficult or impossible in this case." *Id.; see also EMI April Music, Inc. v. White*, 618 F. Supp. 2d 497, 511 (E.D. Va. 2009) ("where calculation of damages and profits for each future event might be possible, the impracticality of doing so because of the speculation and guesswork militates in favor of finding that money damages are inadequate remedies").

In addition, when the failure to grant preliminary relief creates the possibility of the loss of goodwill or the permanent loss of customers to a competitor, the irreparable injury prong is satisfied. *See Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 552 (4th Cir. 1994). Here, Palantir products, developed through the misappropriation of i2's trade secrets and infringement of its copyrights, enable Palantir to seamlessly import data residing in i2's software products. *See* Parker Decl. ¶¶ 50-51. Palantir specifically touts these importing abilities to claim that its applications are superior to the Analyst's Notebook, causing a concrete loss of goodwill. *Id.* ¶ 48 ("By structuring the cards from the Analyst's Notebook file, we are able to increase the amount of information we extract beyond what was originally available in the Analyst's Notebook file itself;" ". . . by using Palantir's superior data integration, data aggregation, and data visualization, we are able to learn things about our data that we never would've been able to in Analyst's Notebook."). From Palantir's public behavior, it is clear that its goal is to migrate i2 users off of i2's software, made possible through its misappropriation and infringement of i2's intellectual property. *Id.* ¶ 58. Further, i2 has lost key contracts to Palantir. In each instance, without the importing functionality developed by using the misappropriated i2 software and other trade secrets, Palantir's software would not have even been considered as an alternative. Parker Decl. ¶¶ 59-61.

Courts have also issued injunctive relief where the defendant has acknowledged in a contract that misappropriation of trade secrets or confidential information could cause the other party irreparable harm. *See N. Atlantic Instruments, Inc. v. Haber,* 188 F.3d 38, 49 (2d Cir. 1999) (acknowledged through employment agreement)*; Real Networks, Inc. v. DVD Copy Control Assoc*., 641 F. Supp. 2d 913, 954 (N.D. Cal. 2009) (issuing preliminary injunction where parties' contract stipulated that certain breaches of license to copy control technology would result in irreparable harm ). Under Section 15.1 of the June 2006 License Agreement, the licensee

"understands that any violation of the obligations contained in Sections 2, 7, or 8 of this Agreement would cause irreparable injury to i2 and that monetary damages are not sufficient to compensate i2" and "acknowledge[d] and agree[d] that i2 has the right to obtain an injunction without the necessity of posting bond to prevent the actual or threatened breach of the provisions of this Agreement…" Carty Decl., Ex. J at § 15.1. i2 has suffered and continues to suffer the irreparable harm envisioned by this provision. Defendants cannot claim otherwise, particularly after acknowledging that i2 would be irreparably harmed by the very conduct that they later engaged in.

### D. The Balance of Equities Weighs Heavily in i2's Favor

Defendants will suffer no legally cognizable harm if they are required to return, delete, and cease further use of i2's software and trade secrets, which they have acquired through fraudulent and illegitimate means. Defendants cannot claim to suffer cognizable harm by losing something to which they never had a right. *Datatel*, 2005 WL 1668020, at *6 ("R&T will suffer no legally cognizable harm from being ordered to respect Datatel's rights in its copyrighted works and trade secrets and to refrain from inducing Datatel's customer, NCCCS, to breach its obligations of confidentiality."). In addition, the court may take into account the deceitful nature of Defendants' conduct to award i2 injunctive relief. *See, e.g.*, *Safeway, Inc. v. CESC Plaza Ltd. P'ship*, 261 F. Supp. 2d 439, 472 (E.D. Va. 2003) ( "the balancing of the equities also typically includes consideration of other traditional equitable factors, such as the innocence or culpability of the parties [and] the presence or absence of bad faith or ill motive on the part of either party…").[20]

---

[20] i2 seeks injunctive relief to ensure that SRS and its members do that which they have already agreed to do in the license agreements at issue. "An injunction that merely commands a party to perform its contractual obligations does no harm to that party." *Sci. Applications Int'l. Corp. v. CACI-Athena, Inc.*, No. 1:08cv443 (JCC), 2008 WL 2009377, at *4 (E.D. Va. May 8, 2008) (citing *JTH Tax, Inc. v. Lee*, 514 F. Supp. 2d 818, 825 (E.D. Va. 2007) and *A.P. Moller-Maersk A/S v. Escrub Sys., Inc.*, No. 1:07cv1276 (JCC), 2007 WL 4562827, at *3 (E.D. Va. Dec. 21, 2007).

Moreover, i2 has narrowly tailored its motion for preliminary injunctive relief to only enjoin the conduct that is patently likely to succeed on the merits based on the uncontroverted evidence currently available. The preliminary injunction is limited only to trade secrets, copyright protected material, and other confidential information subject to the SRS licenses for which Defendants have no legitimate claim. It does not reach Palantir products that were developed without reliance on the products i2 licensed to SRS and therefore does not unreasonably hinder Palantir's business. *See Datatel*, 2005 WL 1668020, at *1 (rejecting argument that preliminary injunction is improperly overbroad where injunction was "narrowly tailored to limit the scope only to prevent [defendant]'s misappropriation of [plaintiff]'s copyrighted material and trade secrets and does not prevent [defendant] from engaging in business"). Thus, the harm that Defendants will face if required to return and cease the further use of i2's confidential and proprietary information, as compared to the grave harm that i2 faces daily in the absence of injunctive relief, tips the scales decidedly in i2's favor.

**E. Public Policy Considerations Favor the Prompt Injunction of Defendants' Misconduct**

The public interest is unquestionably served by protecting i2's right to protect its intellectual property and to and uphold its contractual rights. The public interest is served by enjoining the infringement of valid copyrights and the misappropriation of trade secrets. *See, e.g., F.A. Davis Co. v. Wolters Kluwer Health, Inc.*, 413 F. Supp. 2d 507, 516 (E.D. Pa. 2005) (finding "public interest is served by upholding and protecting valid copyrights"); *Physicians Interactive*, 2003 WL 23018270, at *10 ("This Court has an obligation to enjoin any alleged computer hackers from continuing to attack and steal [plaintiff]'s proprietary information"); *Morgan Stanley DW Inc. v. Rothe*, 150 F. Supp. 2d 67, 79 (D.D.C. 2001) (finding "court serves the public interest in protecting trade-secret client lists and other confidential information…."). *See also Apple Computer, Inc. v. Franklin Computer Corp.*, 714 F.2d 1240, 1255 (3d Cir. 1983); *See e.g., Bowe*

*Bell & Howell Co. v. Harris*, 145 F. App'x 401, 404 (4th Cir. 2005) Accordingly, granting the requested injunctive relief would further the public interest.

Finally, the public has a strong interest in ensuring that contractual commitments are upheld, and this interest favors injunctive relief to enforce them, especially to protect intellectual property rights. *Compass Bank v. Hartley*, 430 F. Supp. 2d 973, 983 (D. Ariz. 2006) (public interest served by protecting confidential information and trade secrets, enforcing contractual rights, and preserving legitimate business operations); *UBS Painewebber, Inc. v. Aiken*, 197 F. Supp. 2d 436, 448 (W.D.N.C. 2002) ("The public has an interest in ensuring that contracts are enforced."); *Smith v. Newport News Shipbuilding Health Plan, Inc.*, 148 F. Supp. 2d 637, 653 (E.D. Va. 2001) (noting the public's interest in the enforcement of parties' agreements).

## IV. CONCLUSION

For the foregoing reasons, i2 requests that the Court enter a Temporary Restraining Order or a Preliminary Injunction, applicable until the conclusion of the case, directing the defendants to (1) immediately cease using all software applications and related hardware and documentation delivered by i2 to any of the defendants; (2) return to i2 all such items, but to forensically preserve electronic copies of each of the item from their computer systems, servers or other storage devices in a secure manner such that Palantir does not have continued access to the items; and (3) certify to the Court the steps taken to cease using, to return and to preserve the items.

Dated: August 11, 2010

COOLEY LLP

By: /s/ Robert R. Vieth

Robert R. Vieth, VSB 24304
MaryBeth W. Shreiner, VSB 75592
COOLEY LLP
One Freedom Square | Reston Town Center
11951 Freedom Drive
Reston, VA 20190-5656
Telephone: (703) 456-8000
Facsimile: (703) 456-8100
Email: rvieth@cooley.com
Email: mshreiner@cooley.com

OF COUNSEL
Christopher J. Sundermeier
Mark F. Lambert
Neha M. Marathe
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304-1130
Telephone: (650) 843-5000
Facsimile: (650) 849-7400
Email: sundermeierc@cooley.com
Email: mlambert@cooley.com
Email: nmarathe@cooley.com

**Attorneys for Plaintiffs**
**i2 Inc. and i2 Limited**

## CERTIFICATE OF SERVICE

I hereby certify that on the 11 day of August, 2010, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system.

Also, the foregoing were served on the defendants with the Complaint.

/s/ Robert R. Vieth
Robert R. Vieth, VSB 24304
COOLEY LLP
One Freedom Square|Reston Town Center
11951 Freedom Drive
Reston, VA 20190-5656
Telephone: (703) 456-8000
Facsimile: (703) 456-8100
Email: rvieth@cooley.com

875086 v6/HN