UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

-------------------------------:

i2 INC., et al.,
Plaintiffs,

-vs- Case No. 1:10-cv-885

PALANTIR TECHNOLOGIES, INC., et al.,
Defendants.

-------------------------------:

HEARING ON MOTIONS

October 29, 2010

Before: Mag. Judge John F. Anderson

APPEARANCES:

Christopher J. Sundermeier and Robert R. Vieth,
Counsel for the Plaintiffs

Jon B. Streeter and D. Bradford Hardin, Jr.,
Counsel for the Defendants

NOTE: The case is called to be heard at 9:32 a.m. as follows:

THE CLERK: i2 Incorporated, et al. versus Palantir Technologies, Incorporated, et al., civil action 10-885-cv.

MR. VIETH: Good morning, Your Honor. Robert Vieth of Cooley. Your Honor, this morning I would like to introduce the Court to Christopher Sundermeier of our firm. Mr. Sundermeier is a member of the California Bar. And with the Court's permission, he will be handling today's argument.

THE COURT: Okay, thank you. Good morning, Mr. Sundermeier. Good morning, Mr. Vieth.

MR. SUNDERMEIER: Good morning, Your Honor.

MR. HARDIN: Good morning, Your Honor. Bradford Hardin and my colleague Jon Streeter, who is also a member of the California Bar, but admitted pro hac vice to the Bar of this court. He will be arguing the motion this morning on behalf of Palantir Technologies.

THE COURT: Okay, thank you.

Okay, Mr. Streeter, just to let you know, I have reviewed all the pleadings that have been filed in the case. What I intend to do is basically rule on the ones that I am prepared to rule on, and then I will ask questions about ones that I seem to have questions about.

So, I am not going to have-- I mean, I have read all the papers. I think the issues are fairly clear on many

of the, many of the document requests, but there are some that I will need to ask either you, Mr. Streeter, or you, Mr. Sundermeier, questions about.

Before I do that, are there any other-- I mean, have you all come to resolution of any of the issues-- I mean, I got the reply yesterday. So, hasn't anything changed overnight or this morning that you've resolved any of the matters that are before me now?

MR. STREETER: No. We haven't had an opportunity to update our meet and confer, although I did notice that in the opposition there was a change of position by i2 on a couple of categories. Although it doesn't appear that those are changes of position that would lead to resolution.

THE COURT: Okay. Well, on document requests 1, 2, 3 and 4, those four requests that relate to the interoperability issues, Mr. Streeter, I will tell you, and this goes for everybody on this case, that document requests that go for all documents and things relating to something are going to be hard to get this Court to enforce.

I do find based on the information that was contained in the pleadings that have been provided, that the, I guess, agreement of i2 in this case to produce the documents that are related to the interoperability of the i2 products at issue in this case with the Palantir products and documents that reflect communications from third parties that i2

products be made interoperable with the Palantir software, is an appropriate response to those four document requests.

So, as set out in the opposition as to what was agreed to or what was proposed as their responses to document requests 1, 2, 3 and 4 I think is appropriate.

For document requests 21, 22, 23 and 24 having to do with the license agreements and the time period for doing that, I think that the issues got narrowed a little bit in the pleadings, but I think the one issue that I see and I'm prepared to rule on without any argument is the time period of the license agreements.

So, I do want i2 to produce the representative forms of its license agreements for its products at issue and for every government customer, but I want it to be for those license agreements that were in effect on March 2006 and that were entered after March 2006, not a time limitation of only entered into after March 2006. And a copy of the-- Yes.

MR. SUNDERMEIER: May I comment, Your Honor?

THE COURT: Comment? Well, you can get a clarification. I am not going to hear any argument on it, but is there anything that is unclear about that ruling?

MR. SUNDERMEIER: No, except that that, because it is a perpetual license, that means every license that the company since 1990 has entered into.

THE COURT: That's different than its form license.

So, if you have used different forms in the past and those forms are still in existence and are relevant to the time period in March of 2006, then you will have to produce those representative license agreements.

I also am going to require you to produce copies of any contracts or agreements with terms that are different from those form agreements, which is I think something you had indicated you would be willing to do.

MR. STREETER: Your Honor, a point of clarification on that. There could well be contested issues concerning the royalty rates in the licenses, and I would understand every unique royalty rate to be something that is not necessarily part of a form agreement.

So, we don't want to see a blank form agreement with no royalty rates. Every individual royalty rate is unique and ought to be produced.

MR. SUNDERMEIER: Your Honor, we don't charge by royalty rate.

THE COURT: Okay. So, I don't think that will be an issue.

MR. STREETER: Well, the level of compensation that is charged, whether it is a royalty, it could be a flat fee. Whatever the fee is, the damages experts could well be addressing what is charged for licenses, and we are entitled to know what the--

THE COURT: Well, your argument for wanting these agreements had to do with interoperability and the rights and the licensing rights. That's the argument that you made in having me try and rule on these document requests for 21, 22, 23 and 24, that it had to do with the rights that were given in doing that. It didn't really talk about what had to do with any damages issues, did you?

MR. STREETER: Well, the reason we would seek the terms of licenses, Your Honor, goes not only to the technical issues, but also to the damages issues. And to the extent that experts are going to be preparing opinions about what licenses are worth, it seems to us that each unique term that has to do with how much they charge is not a matter of a form, it is a unique term and it goes to pricing.

MR. SUNDERMEIER: Your Honor, they have asked for pricing information. We have agreed to produce pricing information for our prices for the license. We don't, we don't charge a royalty. We charge a price for them. And we have agreed to produce that.

Putting it in the context, license means producing every license that might have a different price term going back 20 years, which--

THE COURT: Right. So, to the extent you are asking for clarification, I'm not requiring them to produce each license agreement that may have a compensation term that may

be different. Only the terms relating to the right to use and distribute or whatever. And I assume you will be producing pricing information in another format relating to those.

As to document request number 45, you have agreed to produce, Mr. Sundermeier, the documents that are relating to the discussions with the Los Angeles Police Department that relate to interoperability, is that correct?

MR. SUNDERMEIER: Yes.

THE COURT: I think that's sufficient response to document request number 45.

Turning to 36 and 37, the document requests relating to profits and costs, the financial statements and costs of sales and generations, I do think that the discussions that related or that i2's agreement to produce documents showing the revenue, profits and costs related to the development and the sale of the products at issue in this case are sufficient for 36 and 37.

I do think that 38, that i2 should produce documents that reflect i2's shares in the market for i2 products at issue.

So, I do think that some market share information and documents, and corollary to that is 39, the documents relating to competitions, I think in the market for the products that are alleged in this action. So, both 38 and 39 I think are proper to some extent, but just documents

reflecting i2's share of the market for i2 products at issue and documents reflecting the competition in the market for the products alleged in this action, is the appropriate, would be the appropriate responses to 38 and 39.

40, I need some discussion on 40, which is all documents related to any customer of i2 for whom i2 claims it has lost business or revenue due to the conduct.

What is objectionable about number 40, Mr. Sundermeier?

MR. SUNDERMEIER: Well, for example, the FBI. We have been working with the FBI for many, many years going back to, I don't know, mid 1990's. Every document-- And those documents would pertain to technical issues, they would pertain to-- I mean, it would be a vast amount of information which has nothing to do with this case.

We have agreed to produce the license agreements with them. We have agreed to produce information relating to, you know, costs and pricing from us. We have agreed to produce any information that relates to the actual loss of that business.

But to say, produce everything, every document that relates to each of the customers that we claim that we lost business, encompasses a very broad array of irrelevant stuff.

We think we've, we think in the other requests and in this request we have narrowed that so that they are getting

a broad scope of what they need. But certainly not every document that relates to the FBI, for example, would be relevant or even reasonably calculated to lead to the discovery of admissible evidence.

THE COURT: Okay. Mr. Streeter, what's your response to that?

MR. STREETER: First of all, with respect to time frame, Your Honor, and this runs throughout the opposition on a number of the requests, we are not seeking every piece of paper going back to 1990. They have suggested that the relevant time frame goes back to 2006, that's reasonable and fine. They're asking for damages, that's what they claim going back to that point in time, and we're not requesting anything more.

The customer losses, however, could have a number of causes. And we're entitled to examine the communications back and forth within the customer relationship to determine what in fact, if there was a loss of business, why did the customer decide to go elsewhere. It may have had to do with some other competitor of i2, not Palantir. It may have had to do with the fact that Palantir is not keeping up with the expected features and advantages that the customer desires in today's marketplace.

THE COURT: But you're asking for all documents relating to any customer in which they claim that they have

lost business. You're not limiting the request as to any area in which those documents relate to.

MR. STREETER: If there--

THE COURT: Am I right in that fact? I mean, the way that you've phrased that request, it's any type of a document that relates to any customer of i2. So, whatever the customer is, whoever it is, any document that relates to that customer is what you're asking for in document request number 40?

MR. STREETER: Well, if there is, there is a nexus clearly to lost business here. And if i2 is going to be determining for itself what the cause of a diminution in business is, that's problematic.

We would like to examine the communications, and it may be communications having to do with servicing a customer on a broad array of topics. We're not asking for administrative documents and--

THE COURT: Yes, you are.

MR. STREETER: Well--

THE COURT: I mean, the way that it's phrased, that's what you're-- All documents. You haven't limited it in any way whatsoever.

MR. STREETER: Well, we gave examples of the kinds of things that may be of interest. We want to know about the financial ebbs and flows of the revenues with particular

customers. And the invoicing persons, the work orders that customers are placing with i2 are going to tell us what the trends were with particular customers.

So, clearly what we're trying to get at here, Your Honor, is the issue of causation. And if the limitation that i2 is proposing is placed on this request, then they are simply going to be determining for themselves that they have got lost business with the FBI. It was, it was the fault of Palantir. So, we'll cherry-pick and give you a handful of documents relating to that.

We're entitled to a more representative sample of what's going on with a particular customer, and we're not asking for everything going back to 1990. They have suggested 2006 as a time frame limitation. That's perfectly fine.

THE COURT: Well, I can't order them to respond to a document request that asks for all documents relating to any customer of i2, from whom i2 claims it has lost business or revenue.

I mean, that just is so overbroad and would have-- Just because they claim that a customer, they have lost business from a customer, doesn't mean that they should be required to produce every single document that relates to that customer even for a time period from 2006 to the present. That just--

MR. STREETER: Your Honor, we're prepared to accept

a limitation on this having to do with lost business. But we don't want to be put in a position where they are determining that this is something that happened as a result of Palantir, and we're going to give you communications relating to why this customer went to Palantir instead of staying with i2.

We need more information about the customer relationship, and we are prepared to accept a limitation concerning any lost business or any diminution in business.

THE COURT: Okay. Well, I do think with the limitation of documents relating to the loss of business or I guess loss of business between any customers is appropriate since you are claiming that you did lose business from these customers, that producing documents from those customers that are related to the loss of the business to those customers is appropriate.

So--

MR. SUNDERMEIER: And, Your Honor, we have agreed to that, that's what we said--

THE COURT: I do think that's an appropriate limitation.

41, I will limit it, the request of 41 as to price lists, plans and policies as to the products at issue in this case. I am not going beyond the products at issue.

I don't find that the documents in request 42 are appropriate in this case. So, what may or may not have been

given to Silver Lake Partners really doesn't have any significant bearing on the issues that are in this case. So, I am not going to require a response to-- Well, I will sustain the objection to document request number 42.

46--

MR. STREETER: Your Honor, you're only entertaining requests for clarification?

THE COURT: Which one are you talking about--

MR. STREETER: 42--

THE COURT: The documents given to Silver Lake Partners? I have read the arguments on that. I don't think it's appropriate for me to order them to respond to that request.

While some of the information that they did may or may not be relevant, all the documents that they gave I don't think is relevant. So, as worded, I am not going to require them to provide a response to 42.

46. You know, Mr. Streeter, what is it-- You know, it concerns me when people serve document requests like this. Documents sufficient to show current, former and potential customers.

I mean, what do you mean by potential customers? Everybody in the world could be a potential customer, couldn't they?

MR. STREETER: Well, in the marketing activities

that i2 carries out, certainly there are target entities that they consider to be potential customers. And, no, everybody in the world is not a potential customer of i2. So, I would respond in that fashion to Your Honor's last point.

With respect to the reason for this request, any time i2 shares information that it claims it categorically will not provide to its competitors, that is flatly inconsistent with the position they have taken concerning their license restrictions and the nature of the trade secrets involved in this case.

And if we were to discovery that on their list of customers or even their potential customers, and there I mean entities that they are actively pursuing for business, that there is a competitor of theirs on that list, we're entitled to know that because it contradicts fundamentally a position that they are taking in this case.

They have raised objections on the ground that this is highly sensitive information. We have a protective order. They are entitled to mark information that they produce in this case as available only to litigating counsel only. So, that ought not to be a concern.

And this does go to something that could be quite basic to whether or not we even in fact have trade secrets at issue in this case.

MR. SUNDERMEIER: Your Honor, the first time this

argument was ever raised was in the moving papers. It has never been raised before that.

This isn't a request for have you ever sold to your competitors or if you've ever entered into agreements with competitors, produce those. We are our producing license agreements in this case.

And even if this were appropriately narrowed, and it never was before this hearing, producing every potential-- I mean, our products are sold differently. We sell our product at a, it is a relatively minimal cost. And we sell it, you know, in an installation that could be sort of on a single desk top as opposed to Palantir's, which is, you know, as they claim a million-plus installation.

So, our potential base is huge. And it includes anybody who does any kind of fraud investigation or any kind of intelligence analysis. And our actual customers, again, are highly sensitive information and it's not relevant unless we're claiming lost profits to it.

We are giving them the license agreements. You know, if the sole issue is have we ever licensed to a competitor or sold to a competitor, then that is something that can just simply be asked.

THE COURT: Well, I am going to require a response to 46, but limited to documents sufficient to show customers of i2 from March 2006 to the present. So, it will be limited

in the time scope.

I won't require potential customers because I don't quite understand what that, how one could properly respond to a request like that.

But anyone who was a customer from March 2006 to the present should be provided on a list. And it can be marked attorney's eyes only under the protective order.

On 54, all documents relating and things relating to any planning or products undertaken by you to develop updates, features, enhancements to i2 products in order to meet the competition.

What's the relevance of that, Mr. Streeter?

MR. STREETER: It goes to causation, Your Honor. Our view, Your Honor, is that this is a dated project, product that i2 sells. And to the degree that they have got losses that are going to be claimed here, we're entitled to present evidence that the reason is their deteriorating quality in failing to meet the needs for the most current features and the most advanced capabilities of the software in this area.

So, that's the reason that we ask for this particular category.

THE COURT: Well, what-- If they're planning to update their product, what does that have-- I'm still, I'm still confused as to what relevance that would have to the issues in this case.

MR. STREETER: If they--

THE COURT: I assume that every software developer is always looking to enhance its products, you know, from one version to the next. That they don't just make it and let it sit there and don't try and do some type of enhancements as technology and things differ, the needs of customers differ. But--

MR. STREETER: I would respectfully suggest that that's not, that that's far too general an assumption in this field.

Our view, again, is that this company has fallen behind in meeting the needed features that are required by customers in today's market. And the kinds of things that it is doing to catch up are highly relevant to the case we will make in this respect.

So, I mean, you're assuming the answer to the question, which is that they are current and that they are always remaining current. If they are working on features that most competitors in this marketplace installed and began offering customers five and six years ago, that will certainly be relevant to the--

THE COURT: Well, what's relevant is whether they have them or not, whether they are working on them or not. And you know what their features are on their current products. And they're saying that, you know, the claim is

based on what the current products are, not on what may be in the work for future products, right?

MR. SUNDERMEIER: Your Honor, I would point out too that since the time that Palantir began obtaining our products, they got version 6, version 7, version 8, version 8.5, so there have been four versions in the last four years. We do constantly update.

This would be an enormous undertaking. And I'm not, again, I'm not sure I see the relevance of it, particularly since if they are asking for information relating to lost, you know, client dissatisfaction with our products, or client need for different features, that's the sort of stuff that falls within other categories we have already agreed to produce.

So, we feel like we have already agreed to produce the core of what they want here. And, you know, there is, if there are specific things again that they want relating to the competition, that's different than every document relating to all our product development.

THE COURT: Well, I have ordered some documents to be produced having to do with competition and what your market share is and what you will need to do for the products at issue, and I think that's sufficient. I'm not going to require a response to 54.

To the extent that there is any relevance, and I'm still at a little bit of a loss to how what they may be

working on in the future would be relevant to what they are providing today and what, whether their product that is currently in the marketplace is competitive or not, is pretty tenuous.

And I think under the circumstances of the, looking at what, you know, the importance of the issues at stake in the action and the burden of producing that type of information, is certainly far outweighed by any limited relevance that it may have.

Going to I guess now the communication issues in 28. And I think the opposition that was filed didn't quite, I couldn't track the number, there were some numbering issues I think in your opposition. You were--

MR. STREETER: I believe that they referred to request number 1, which was supposed to 28.

THE COURT: 28.

MR. STREETER: And number 2 was supposed to be 29.

THE COURT: 29. And 3 was supposed to be 30.

MR. STREETER: Right.

MR. SUNDERMEIER: Oh, my apologies.

THE COURT: And 4 was supposed to be 55.

MR. STREETER: Right.

THE COURT: Okay. Well, let me hear from Mr. Sundermeier on those. I mean, I don't really understand what your objections are. If you're sending copies of this

complaint out and marketing it as something or describing it in some way, why wouldn't that be relevant to the issues in this case?

MR. SUNDERMEIER: Well, first of all, I think, one, we're not.

THE COURT: Well then--

MR. SUNDERMEIER: But again, if the question is as to whether, is there an agreement to produce, I mean, there was a press release issued in this case. Our question is really is this an appropriate avenue of discovery.

We have advised them that we aren't sending this complaint out and that our communications have been extremely limited. The issue is what's the relevance of customer communications.

They're saying it has to do with the, you know, this suit is somehow brought in bad faith, but they have got no claim which would relate to that.

So, from our perspective with the communications we have had with the customers concerning this, is not relevant to the suit.

THE COURT: Well, it depends on what the communications say. And I can't make a determination as to whether they are or aren't relevant.

You could be sending communications to people saying, you know, attached is the complaint, we filed this, we

don't really believe in it, but we filed it. Or we don't intend to pursue it. Or you could be making statements, you know, that are not in your interests that could be binding on you if they were made by certain individuals.

So, I don't see the basis for you not responding to document requests 28, 29 and 30. I think those, certainly if they relate to your dissemination of information or descriptions or summaries of what your claims are in this matter, could be relevant to the issues in this case.

33, Mr. Streeter, what is this one about? This is all documents related to any instance in which an i2 employee obtained or requested information about a third party under a name other than I guess his or her own name.

MR. STREETER: Right.

THE COURT: This is the two wrongs make a right request, is that what you're trying to do here?

MR. STREETER: Well, first of all, in the opposition my understanding is that they have agreed to give us documents relating to attempts to obtain confidential information under a pseudonym.

And the whole COPLINK, LASD situation appears to us to have involved a situation where there were efforts made to obtain confidential information from Palantir on behalf of i2, at least that's what the circumstances suggest.

And that is a situation in which i2 was actively

trying to combat integration with Palantir. So, it directly has to do with the pleaded claim that we have about attempts to defeat any form of interoperability with Palantir. And in that situation there appears to be some evidence that there may have been deception involved.

So, yes, we're interested in-- It's not a two wrongs don't make a right situation. But we do have a specific customer example here where that was done. And so, we have asked a broader question here about whether there are any other efforts surreptitiously to obtain confidential information about Palantir.

MR. SUNDERMEIER: Your Honor, if I could address that. The situation Mr. Streeter is referring to where Palantir worked with a company that was recently acquired by i2 called COPLINK occurred before there was any relationship between i2 and COPLINK.

So, I'm not sure what the relevance of that has to do. It is also a product that is not at issue.

Nonetheless, we have agreed to produce any documents relating to that situation that they are referring to. And we've also agreed to produce any documents relating to any surreptitious attempt by us to get information relating to Palantir, and we've told them in our interrogatories there are none.

So, what they are really doing now is broadening

this and asking a sort of broader question, have you ever done this anywhere else at any other time.

THE COURT: Well--

MR. SUNDERMEIER: And, you know, I don't see the relevance of that.

THE COURT: Well, let me make sure, your agreement is to-- Is your agreement to provide them documents that relate to you're attempts, any attempts, if any, to obtain confidential information through a pseudonym? Or is it only confidential information relating to Palantir through a pseudonym?

MR. SUNDERMEIER: We agreed to do this with respect to Palantir. When this came up, their justification was, essentially was two wrongs make a right here. Their articulation to us was, well, we want to see if you did this because this relates to our, you know, our unjust, our unclean hands and our unfair competition potential claims.

We said, look, if there is some concern about whether we have ever done this with respect to Palantir, we will provide you with that information. And we responded to interrogatories saying, there are no such instances where this occurred.

So, that's what we have agreed to do. Now they have sort of changed their theories here and the request is, have we ever obtained, tried to obtain information surreptitiously

from someone else.

And again, my concern is not, is really is that an appropriate avenue of discovery? It's not related to an unclean hands thing. There is not sufficient connection with this for that to be an appropriate avenue of discovery. It doesn't relate to their products or competition between our products.

And the incident they are concerned about, we have agreed to produce documents. And I think they are-- Because there is no incident there. In fact, the records will reveal that we did not get anything confidential from them. They in fact they still have our confidential information.

THE COURT: Well--

MR. STREETER: Your Honor, there is a broader issue here that I'm, and I'm somewhat reluctant to go into broader argument because Your Honor has read the papers and has indicated an interest only in addressing clarifications to your rulings, but our counterclaim addresses not just A and B, the analyst notebook product line. It addresses both of the product lines that i2 has, including COPLINK.

And it has to do with a business practice that i2 follows and that they are pursuing with respect to all of their products having to do with attempts to block customers from transferring data that is saved in the i2 products into competitors' products, something that we believe is required,

that is desired by customers and is required by law. And--

THE COURT: Well, what law do you think requires that as opposed to policy?

MR. STREETER: It's in statute, it's in the statute, it's 6 U.S.C. Section 485, et seq. This is, there is an extensive statutory scheme that we plead in great detail in our counterclaim that has been implemented by a series of policy guidelines that set standards in this area which takes it out of the normal commercial context where efforts to enforce license restrictions around closed file formats might otherwise be perfectly fine. Not here.

And we're entitled to develop a case and present in support of our counterclaim evidence relating to all of the products, not just the product A and B that i2 wishes to say is in issue because that's what it pleaded in its complaint.

So, particularly deceptive or conduct that is undertaken by artifice to try to enforce-- They are literally trying to enforce walls between government agencies and the data transfer between government agencies. And we think that that raises very, very serious issues. And that's why we're conducting discovery that gets at what they've done to try to enforce those restrictions.

So, you know, and that's implicated here. It's implicated in requests 1 through 4 which have to do with interoperability more generally. And i2 is trying to force

this case back into the prism of their own complaint, ignoring the fact that we have placed in issue a far broader set of issues having to do with all of its product lines and this particular business practice.

THE COURT: Well, I'll require a response to document request 33, but limited to the time period from 2006, and obtain or requested any confidential or trade secret information from a third party.

So, I'm not talking about any information. That is, if I wrote to somebody and said, please send me your product brochure and used a different name. It has to be confidential or trade secret type information for the time period from 2006 to the present.

Okay. Document request number 55. Mr. Sundermeier, are there any documents that would be responsive to document request number 55? All documents and things relating to any efforts by you to copy or create something similar to the features, look and feel.

MR. SUNDERMEIER: My--

THE COURT: Well, let me hear what your objection is to that one if you really do have an objection to 55.

MR. STREETER: I am trying to remember, Your Honor, if I, what was the final discussion was there because I believe we did agree to produce certain information that was asked for, information relating to competition between the

parties. We basically agreed to produce the information relating to any competitive intelligence on Palantir.

So, I don't think that, I am not sure this one is still even at issue. But again, I'm not sure-- The fact is that like all companies, we keep track of what other competitors are doing in the marketplace, and look at new developments and features. That's different than going and taking their technology, but-- And we agreed to produce that kind of competitive intelligence with respect to Palantir.

We objected to this request I think primarily because this is going to their two wrongs don't make a right defense or two wrongs do make a right defense.

We're not sure what this has to do with the case. There is no issue here as to whether or not, there is no allegations that we stole their technology or that we copied their technology. They haven't identified any of our features. In fact, all they do is say our features are essentially antiquated and outdated, outmoded. And they aren't saying that we have taken any features from them.

So, to ask for this kind of specific request seems irrelevant.

If there is something there, Your Honor, we had this discussion, if they think there is something we took from them or that we copied in some way, we can address that issue. But that's not part of this case as far as I am aware.

MR. STREETER: Your Honor, Palantir takes a very different view of this situation. Palantir does believe that i2 has been systematically attempting to mimic Palantir's product line, and it has done that in a number of ways.

Palantir has a very different approach to business. It is an open company. It is not a company that tries to restrict by license or other means what it's doing. So, it's not a surprise that other customers are trying to meet its standard.

But what this goes to is causation. If i2 is attempting to chase Palantir because Palantir has better features in any number of different areas, and that is the reason that customers view Palantir as being far superior to i2, that's going to be highly relevant to causation.

When i2 attempts to claim that it is because of the importing functionality that was created, that's the reason that customers switched, we will say, no, it's because our analytical capabilities were vastly superior. Palantir can take and analyze data from any data source from around the world.

I2 is limited to its own file formats, and that imposes a very tight restriction on what customers can do. And customers are tending to prefer the way that Palantir sets up it's user interface in any number of ways. And we ought to be able to show that customers are demanding, wanting a user

environment in a--

THE COURT: Okay, I understand your argument. I will require a response to request for production 55. I think that arguably has some relevance to the issues having to do with the damages side of this case. And if in fact there are such documents, they should be produced.

Okay. I think that's taken care of the broad range of documents that have been presented in these motions.

Okay. Thank you, counsel.

MR. STREETER: Thank you, Your Honor.

MR. SUNDERMEIER: Thank you, Your Honor.

NOTE: The hearing concluded at 10:15 a.m.

------------------------------------------------

C E R T I F I C A T E of T R A N S C R I P T I O N

I hereby certify that the foregoing is a true and accurate transcript that was typed by me from the recording provided by the court. Any errors or omissions are due to the inability of the undersigned to hear or understand said recording.

Further, that I am neither counsel for, related to, nor employed by any of the parties to the above-styled action, and that I am not financially or otherwise interested in the outcome of the above-styled action.

/s/ Norman B. Linnell
Norman B. Linnell
Court Reporter - USDC/EDVA