UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

--------------------------------:

i2 INC., et al.,
Plaintiffs,

-vs-

Case No. 1:10-cv-885

PALANTIR TECHNOLOGIES, INC., et al.,
Defendants.

--------------------------------:

HEARING ON MOTIONS

December 3, 2010

Before: Judge Liam O'Grady

APPEARANCES:

Robert R. Vieth and MaryBeth Shreiner,
Counsel for the Plaintiffs

John W. Keker, Elliot R. Peters and D. Bradford Hardin, Jr.,
Counsel for the Defendants

THE CLERK: Civil action 1:10-cv-885, i2 Incorporated, et al. versus Palantir Technologies, Incorporated, et al.

MR. VIETH: Good morning, Your Honor. Robert Vieth of Cooley on behalf of the plaintiffs. With me at counsel table is my colleague Marybeth Shreiner of our firm.

MS. SHREINER: Good morning, Your Honor.

THE COURT: Good morning, or good afternoon.

MR. KEKER: Good afternoon, Your Honor. John Keker with Elliot Peters from Keker & Van Nest, and Bradford Hardin from Wilmer Hale, for defendant Palantir Technologies, Inc.

THE COURT: All right, good morning to each of you.

This comes on for a motion to dismiss the counterclaim filed by Palantir and also two of the affirmative defenses. I have reviewed the pleadings of the parties and looked at the regulations that were identified in the Congressional Record and the Uniform Computer Information Transactions Act out of the Virginia legislature. And I will hear anything else that you would like to say.

MR. VIETH: Good morning, Your Honor, and thank you. Robert Vieth of Cooley again.

Your Honor, I understand the Court has read the record, so I will not dwell too long on this, but it seems to me the core issue, even if one assumes that Palantir has standing to raise these issues and that the Court has

jurisdiction to entertain them, the core issue on the merits as to whether there is a federal policy embodied in these various statutes and regulations and directives that have been assembled by Palantir that can overturn the contractual license agreements of a company like i2 retroactively, particularly when those agreements protect trade secrets and the like, and the answer is just simply no. The law clearly favors enforcement of contracts.

For that reason, there is a very, very heavy burden on Palantir to come up with a policy that is not just a generalized statement or expression of public purpose, but really a law or at a minimum court precedent that expresses a specific, dominant, well-defined public policy. And there just is no such thing here.

And the Virginia UCA in fact confirms that in spades for the reasons that we've stated in our papers. We frankly think this is, I cannot figure out a principled way to distinguish this motion from the earlier motion that Your Honor held or entertained and ruled upon when there was Palantir's motion to dismiss i2's complaint. The same arguments, perhaps dressed up slightly differently, were raised then.

Unless the Court has specific questions, I don't plan to go through every one of the statutes or directives that has been cited by Palantir, but I will note that at least

a couple of them, as we stated in our papers, make clear that there is no federal preemption and they are not designed to overturn contractual obligations and they are not designed to benefit or to create private rights of action for parties that we think are like Palantir in this case.

Of course, there has been no case law cited, I should add that, that remotely resembles this case or overturns a contract based on these federal policies if they even exist.

So, for that reason and the reasons we have stated in our papers, we think the motion should be granted.

THE COURT: All right, thank you.

MR. VIETH: Thank you, Your Honor.

THE COURT: Mr. Keker.

MR. KEKER: Thank you, Your Honor.

With the Court's indulgence, I would like to go through this piece by piece because I think that the briefs, particularly the reply brief, show that we're not talking in the same language.

THE COURT: Well, I don't disagree with you there. They are citing to Section 485 and the regulation executive order 13,388 and the law regarding private parties when they have a right to, you know, assert this right to public policy to avoid the copyright laws.

And you're talking-- And unless you can convince me

otherwise, this is like Alice in Wonderland, there is no foundation here. There is nothing--

MR. KEKER: If I could try. I start with what we're doing. We are bringing an action for declaratory relief. They say there is no claim.

We say, citing the Volvo case, the claim for declaratory relief is pretty clear. There has got to be a substantial controversy between the parties, adverse controversy that is ripe for decision. There has got to be federal jurisdiction. And then the judge has to decide whether or not to exercise his discretion.

THE COURT: Well, by what authority could I exercise my discretion? What claim do you have that i2 does not have a right to enter into this contract with the government which the government has not objected to and they have not attempted under any of their programs or information sharing environment to modify?

So, where do you come in--

MR. KEKER: We are not trying to say that they can't enter into the contract with the government. What we're saying is, put aside the dispute that they've brought. They said we've done these nasty things. We have stopped doing whatever we were doing. That's a dispute about the past. Right now there are customers that want, government customers that want interoperability.

THE COURT: Is the government going to enter an appearance in this case?

MR. KEKER: I don't know, Your Honor. I don't have any basis to think that they are, but I don't know.

THE COURT: Isn't that up to the government?

MR. KEKER: Absolutely. But if I could just keep going. What is happening here is that in the future a fully licensed government agency that wants to achieve interoperability so it could use all of its data and import here and export there and use it in different programs, the question that we're asking you to address because there is a dispute about it is whether or not when that licensed government agency says, we are going to make our, this software compatible with the Palantir product so that it can do that, and we are going to do it by asking Palantir to help us or we going to do it ourselves, but however that happens, that interoperability happens, is that a copyright violation.

Because we know now, the reason we say there is an actual dispute, we know that they think it is a copyright violation, they have said so.

So, the government agency, whether we help the government agency do it or not help the government agency do it in the future, we go in and they say, will you work with us, we need to know that it is not a copyright violation for them to do it.

Now, in order to do that-- So, that's the actual dispute, and it is going to keep going on.

THE COURT: But the government itself has said, our efforts to make software compatible for purposes of national defense does not in any way affect the parties. It's an agency-related effort. And it is not meant, none of these are meant to affect the contractual obligations that parties have.

MR. KEKER: We believe that that's incorrect, Your Honor. Paragraph 181 of our complaint says that we believe that the government has said in the contracts that they have with government agencies that they want interoperability.

The reason that we said that we believe that is because the license agreement that we got from them and that they are complaining about--

THE COURT: If that's true, how does that give you any more standing than--

MR. KEKER: Because their contracts cite to the Federal Acquisition Regulations and recognize in the contract-- This is information and belief, this is paragraph 181. And I can show you the contract, that one that we had back then. It says, for any government agency, the FARs, and it cites to certain numbers, have to be followed.

And the Federal Acquisition Regulations, to the extent that they conflict with any provision of this private contract that i2 is doing, the Federal Acquisition Regulations

control.

And we know that the Federal Acquisition Regulations at-- Excuse me. At 48 C.F.R. 52227-19, it's now (b)(2) because it was amended, but say that notwithstanding any contrary provisions in the contractor's standard contracts, the commercial computer software that we buy, that the government buys, may be, number four is modified, adapted or combined with other computer software provided that in the modified, adapted and combined portions of the derivative software incorporating any of the delivered commercial computer software, shall be subject to the same restrictions as set forth in this contract.

So, what the government acquisition regulations say is an implementation we believe of this policy that we have been putting before you and you have been reading, don't sell us computer software that we can't use to access our data and use it with other software.

So, one issue would be in this declaratory relief action where we have got an actual dispute, we have got federal jurisdiction, and we're asking you on a motion to dismiss to let us go forward and look into this-- so, the question would be, what do their contracts say, for example? I mean, do their contracts, like the one they gave us, continue to contain this language, incorporate the FARs and so on.

Then probably more importantly than that, how are they modified in practice? When they go to the CIA or to some other agencies and these agencies have a tremendous amount of data stored in i2 databases, and they are saying, we have got this new great stuff that we also want to use, we want to be able to import our data-- They are not complaining about the export. They are happy to move Palantir data into their system, but the government says we want to make sure we can use our i2 data in this system, how does that actually get worked out.

Because if it does get worked out, as we suspect it has been worked out, it raises a lot of questions about whether or not there is a copyright violation here. I mean, just to stick with that one because that is the federal jurisdiction, they are going to sue us for copyright, that is what the dispute is about.

And so, you could imagine arguments about waiver. You could imagine arguments about laches. You could certainly imagine arguments about fair use, which has not been decided in this case. We asked to dismiss their case because of fair use. And you said, no, forget it, I am not going to do it. But you didn't and you couldn't, the factual record around fair use hasn't been developed.

And with respect to that, I would remind the Court of what I am sure, but I will just read it from the Sega case,

that courts with respect to the primary purpose of fair use are free to consider the public benefit resulting from a particular use notwithstanding the fact that the alleged infringer may gain commercially. Public benefit need not be direct or tangible, may arise because the challenged use serves a public interest.

And depending on what discovery shows in this case as it goes forward, their argument, which they went right to, after arguing about jurisdiction and everything else, they say, no, no, give us basically summary judgment. They are not arguing that we don't have the declaratory relief factors here, that there is not jurisdiction here. They are arguing, no way can they ever prove a case that would permit you to grant the relief that we are requesting.

And the relief that we are requesting, to repeat, is that in the future when we go to a government agency and the government agency says, sure, I want your product, but this has got to be compatible with all of my data, that we can say to the government agency, you've got a license that permits it. Or you've got a license that, if it doesn't permit it, is void as against public policy, or whatever the arguments are--

THE COURT: Doesn't that assume that you have a right to use the copyrighted, assuming-- I am not sure I want to go down this path.

MR. KEKER: Let me try it. No, it doesn't. What

we're saying is that you have got-- You've got i2. And you've got a fully licensed agency. And we're not using anything, we're trying to sell to that agency. And the agency says, I want your stuff, but either I've got to make it or you can help me make it, it's not a question of use--

THE COURT: As I understand your pleadings, you have interoperability in software that you have developed allegedly using plaintiff's copyrighted software.

MR. KEKER: Not anymore. We have taken out-- That's what their case is about.

THE COURT: Well, where is your standing to go to that agency and say, we'd love to help you, but i2 has some copyrights and we want you, government agency, to get rid of that copyrighted restriction, otherwise we can't-- Tell me how you are impeded, if you have your own software that you want to use to contract with the CIA, tell me how i2's separate contract affects your ability to contract with the CIA.

MR. KEKER: I will. First, this is one of the things that they got confused. They have sued Palantir and said, you have got interoperability and you got it wrongfully. That suit will go forward and we will talk about it, that's the case that is before you.

This counterclaim doesn't deal with that suit. This counterclaim deals with what happened afterwards. What

happened afterwards was, oops, we better take this importation interoperability out of our product.

So, right now we are shipping a product that is not, doesn't allow i2 data to be imported into Palantir. That's what we would be going to sell.

So, when we go to try to sell that and the government agency, the government agency will get exactly what you just said from them, oh, you can't, we've got copyrights and so on. Palantir is disadvantaged by that and the government agency is disadvantaged by that.

THE COURT: You are in the same position that i2 is then, right?

MR. KEKER: No, because we have open software and we are happy to have export/import functions-- I mean, our data can go into theirs--

THE COURT: You don't have it now? You took it out?

MR. KEKER: They do-- Because we're open, we have got open software, so it is easy for them to go on the Web site and figure out how our software works so they can combine with it.

THE COURT: Isn't that interoperability?

MR. KEKER: It is from their point of view.

THE COURT: And you are saying you took that out of your own product because of the pending lawsuit?

MR. KEKER: What we took out of our product because

of the or after the pending lawsuit started, I won't say because of it, after the pending lawsuit started and what we currently have is something that does not allow our product to accept the information that is in the database, of the i2 database.

So that the CIA, who has got this cache of information in i2 database and .anb and so on, if they want to import that into Palantir, they can't under our current practices. And we say--

THE COURT: So, there isn't interoperability presently?

MR. KEKER: Going that way, the importation-- Yes.

MR. PETERS: With others there is, with lots of other software there is interoperability.

MR. KEKER: Certainly true. Mr. Peters pointed out, we are interoperable with kinds of other software. And that's part of the name of the game now, is that nobody in the intelligence community wants these, what they call stove pipe data caches where the FBI knows a lot over here and the CIA-- I mean, that's the problem.

THE COURT: Well, you know, I understand, on the macro level, the conflict between intelligence agencies and law enforcement agencies. I faced it as an Assistant U.S. Attorney trying to prosecute national security cases. It was a nightmare then. They have worked I think hard to try to

break down some of the barriers.

So, on the macro level I understand why software should be interoperable. But that's not why we are here. We are not talking policy--

MR. KEKER: Right. So, if I could go back to the elements of declaratory relief on a motion to dismiss. We have got a substantial controversy about whether or not it's a copyright violation for the customer to be able to make this interoperable with our help or without our help. They consider it a copyright violation. We say no. That is a substantial dispute.

There is federal jurisdiction over it for two reasons. I can go into that if we need to, but I think they have given up on that supplemental jurisdiction and also federal question--

THE COURT: You have got to have initial standing to make a claim before we talk about supplemental.

MR. KEKER: But the standing to make a claim is that we are, as Medimmune versus Genentech, which is a case we unfortunately represented Genentech.

THE COURT: Yeah, I am very familiar with it.

MR. KEKER: And won happily a motion to dismiss a declaratory relief action. The Supreme Court told us that we were wrong.

But all that is required is that there be a

substantial, real, you know the words as well as I do-- We have standing because we are, we have an imminent threat and a real threat and a substantial threat of being sued for copyright violation by them as we try to work out interoperability in the future with our customers.

In fact, what we would like to do is go to, what we would do is go to our customers and say, please buy this stuff. Under your license, it wouldn't be a copyright violation for you to make what we are selling you interoperable with everything else that you have.

And to the extent that we-- That's what our declaratory relief action is asking you to grant relief on.

What they are saying is as a matter kind of summary judgment without us getting any discovery or being able to pursue this at all, there is no way, no set of facts under which we would ever be entitled to that relief.

And we simply, just the facts I gave you about what if every one of their contracts is trumped by the Federal Acquisition Regulations? And what if they acknowledged that when they are selling? And what if all of their government customers, non-DoD customers understand perfectly well that once they buy i2's materials, they can do whatever they want with them in terms of interoperability? They would have a very, very tough copyright claim at that point. And it would be easy to defeat that copyright claim.

And the copyright claim would be against us for contributing to the copyright infringement. Or it could be for interference with their contracts. There is a lot of claims that they could bring. That's what give us standing under Medimmune and Volvo and so on.

THE COURT: Why wouldn't be their beef be against the agencies that you contract with?

MR. KEKER: They might. But the way the world works, they are not going to sue their customers. They are going to sue us. But, sure, they could sue the customers too.

THE COURT: How would they have standing to sue you if the government agreed to use your software and you entered into a license? And they then looked at what the government was doing and said, no, you can't use it in this way under our copyright.

MR. KEKER: It would be easy. I mean, if they were right, they could sue the agency and say, you're violating your license and it's copyright infringement. They could sue us for interfering with their contract. Inducing breach of contract. I mean, you wouldn't have to be a very good lawyer to come up with some theories.

And in fact, they have essentially been threatening-- I mean, their position will be that anything that we do that ends up with their government customers using their i2 systems and making them interoperable will be a

violation of various laws.

THE COURT: Well, don't they already have a right to sue you for contributing infringement to anybody that you have licensed if you in fact have violated their copyright claim?

MR. KEKER: They have the right to sue us for-- So far what they have sued us for is this business about SRS and getting their-- And what I am saying is that we have changed-- That sort is going to be cut off.

THE COURT: And they will test that in discovery to see whether in fact you have a separate system and whether you have moved on or not.

MR. KEKER: Correct. Absolutely. But part of the moving on, which is intimately tied up in a compulsory counterclaim kind of way, okay, maybe they are right about that, about what happened in the past, but in the future, this interoperability, the policy behind interoperability, the regulations that talk about modifying things, the practice, which I can't tell you much about because we haven't gotten into any discovery, all of those things may lead to a conclusion on your part that, well, no, if the customer wants it, the slight modifications that are necessary to make it interoperable, is not a violation of the copyright laws, is not inducing breach of contract.

And what Justice Scalia said in Medimmune, we don't have to wait until the house burns down to find that out. I

mean, we know they are going to sue. It is a substantial dispute. This company is based on the whole notion that it needs to sell to the government. The government is based on the notion that it needs interoperability. So, this is going to, you know, it is going to come like this.

And I just go back, Your Honor, to what I don't need to tell you, this is a motion to dismiss. I mean, if they want to bring the argument that this is a bunch of nonsense and you can't do it, summary judgment, fine.

But that's what Rule 56(f) is about. I mean, let us look into this a little bit, develop this, because it's a real dispute and it has real serious consequences.

If they can stay and just keep their data locked up and have better systems for integrating this intelligence not be able to be effectively used or fully used, then it's not just Palantir's problem, it's a national problem.

THE COURT: Okay.

MR. KEKER: This motion started out with jurisdiction, there wasn't any jurisdiction, but I think we have persuaded them and I hope you that jurisdiction is really not the issue. The issue is different.

What I mean by jurisdiction is it is completely-- First it is 1367 jurisdiction, maybe it's compulsory counterclaim.

But then second, the Columbia Gas case was exactly

Columbia Gas bringing a defensive action saying, I am going to get sued by that lady on a 1983 action for improper taking under the Fifth Amendment, and since her case is based on a federal cause of action, that gives me defensive federal cause of action jurisdiction. And that's what we have here.

THE COURT: Okay. Thank you, sir.

MR. KEKER: Thank you.

MR. VIETH: Your Honor, Mr. Keker takes us to task for shifting from jurisdiction, but, frankly, this counterclaim was based-- If the counterclaim cites the Copyright Act, I have forgotten that. I didn't have a copy with me here to double-check it. I know the opposition brief said, no, no, this is based on state law.

And on the state law issues, it is quite clear there is no federal policy sufficient to void these contractual restrictions. I mean, it is clear. It would be, it is frankly a breathtaking request of the Court to suggest that this Court has the power to tear up contracts, particularly based on the federal statutes, regulations, executive orders that are cited in the counterclaim and in the briefing papers on this.

In fact, if our standard contract with the customer incorporated by reference expressly all of those, that still would not be a basis to void the license restrictions that are complained about in this counterclaim.

THE COURT: Do you want to address that FAR and what effect it would have?

MR. VIETH: Your Honor, I honestly don't know. I am not sure that FAR was cited. If it was, I have overlooked it. I don't have a copy here with me.

We directed our papers to the statutes, executives orders that were, and directives that were mentioned in the moving papers.

So, I apologize to the Court for being unable to address that, but that's just where I stand.

There has been some talk about copyright infringement here, not addressed in the briefs at all, but it sounds like this product is not being sold now. So, I don't know that there is a live threat or a sufficient threat of a claim of copyright infringement based on the representations that we are hearing this morning.

They have been sued for copyright infringement. Perhaps it's a somewhat different thing, but I think there is quite a bit of overlap. All of which are prudential reasons why this Court should decline to exercise any jurisdiction it might have over a declaratory judgment claim.

I do think there is a serious standing problem. The government hasn't come to us and said, you have got to change your agreements. And absent that, I just don't think we have got a live controversy that this Court should be considering.

Thank you, Your Honor.

MR. KEKER: The crosscomplaint says in paragraph 181, and we had to allege it on information and belief based on the one that we saw, the expressed terms of many of i2's government contracts require it to permit its government customers to modify, adapt or combine the software it sells to them with other software products used by those customers.

Now--

THE COURT: Do you cite the FAR?

MR. KEKER: No, sir, not there. And we didn't cite-- Just to explain, maybe this was a, maybe we did it wrong, but we didn't think until we got one of their government contracts, a contract with a government agency, that we could say anything other than on information and belief.

And I am telling you now that that information and belief was us reading our own license agreement which has this very strong language in it, which says-- And there is a paragraph 2.3. I mean, it just looks like a form contract, United States government use.

Then point 2 is, if licensee is a U.S. nondefense agency, this agreement shall be incorporated by reference, blah, blah, blah.

It cites the FAR reference that I gave and that that shall apply. And then it says, in the event of any conflict

between the restricted rights identified in the FAR and a provision of this agreement, the former shall govern.

So, that led to the information and belief allegation that we believe should get us into the discovery phase. And after some discovery in this matter, then if they want to bring a summary judgment motion that says, no way under Virginia law or any other law-- We think that is completely wrong. I mean, Virginia law and any other law says if a contract, if a term-- We are not trying to rip up the contract. We are trying to either interpret or limit one piece of these government contracts. And the Virginia law says, if that is void, if something is against public policy, we don't enforce it.

The SBA case, I was really amused to be, after studying for this, the Morris-Griffin case, which is an SBA case, to come in and be listening to some of the same arguments that were made there. That was a case where this, not you, but Judge Doumar I think, said that SBA contracts, exactly for the reasons that you are talking about, don't permit him to enforce this contract that was before him. Void as against public policy. I mean, that's Virginia law.

So, anyway, I have talked enough. We believe that we should be able to proceed to the next stage. I understand your concerns. We are admonished that we better make it good and get to a point, we are on a short leash in this case, and

we think that the motion to dismiss should be overruled and we should go on and be able to do some discovery. And then you could decide what you think about this after we are able to tell you more about what's actually going on out there in their contracts and in practice.

THE COURT: All right. Thank you.

Well, I will look again at the FAR that you have put into the record and see whether there isn't some foundation here.

But on the information in the-- You know, we looked carefully at the government information sharing documents. And as I said, we reviewed the Virginia argument about whether you want to call it fair use or under the Uniform Computer Information Transactions.

Really the only written materials that could guide us on whether there is actually a case in controversy or standing leads you down the same dead-end. Which is that you are not a party that has standing to make a complaint against the government's having entered into an agreement with i2 that has some restrictions that you don't like and allows enforcement of the copyright laws. And that the declaratory judgment action is built on broad public policy concerns, but there is no footing, there is no foundation for you to bring that action.

The government spoke I think clearly about the

limitations that it was placing on its own desire to coordinate and allow for integration of information. And that limitation blocks you, as I read it, presently from bringing this declaratory judgment action.

I don't think the Columbia Gas case changes that. I think that we are looking at entirely different facts here. And that was a little bit out there. Using that as a hook, the Virginia law, there is no basis to bring this action.

So, I will look again at the additional information you brought me, but when you are using cases like-- Well, I mean, under Iqbal and Twombly now, you start using words like imagine and even on information and belief, I am not sure that that passes muster anymore. But there are a whole lot of things as to what if, and what you think may happen in the marketplace, you can envision happening, none of that is enough to get you jurisdiction and a real case in controversy.

So, I will look again, but don't be surprised if I grant the plaintiffs' motion in its entirety because I think they are all, the affirmative defenses are tied to the legitimacy of the DJ action.

You have seen Judge Anderson and gotten whatever rulings he has made on the breadth of discovery. And hopefully that will help you.

You know, I hope that at some stage soon you are going to focus on what's at issue in this lawsuit, which is

whether somebody used somebody else's software without a license, and I think that the time is coming to do that now. And I know that you have other issues, but unless I change my mind, they are not going to be addressed in this case.

So, let's have your company executives start looking at resolving this case before you go spend any more money on the litigation. And perhaps you can-- You are both in the industry, you are competitors. My experience is that when you have ongoing corporations which are competitors, that business people can get together and reach a business decision on this.

And I want you to, if you are not comfortable going in front of Judge Anderson to a settlement conference, I think that pretty shortly you ought to think about ways to resolve this case. If you can't do it, you are going to have a settlement conference anyway or mediation on your own, and you know better than me what point that comes at.

You're releasing a lot of proprietary information to each other in discovery. I know it is all sealed up right now. It isn't going to be sealed if the case goes to trial. And, you know, there is no better time than now to start thinking about whether you can resolve this.

MR. KEKER: Your Honor, we have started thinking about it. And any sort of pressure to think about it sooner rather than later would be greatly appreciated. We would like to think about it and really talk about it now.

As Mr. Peters was telling me what his grandmother used to say about, she threw out the conversational ball and the person caught it and put it in his pocket.

So, we would love to have the conversational ball either before Judge Anderson or something. I mean, just get talking.

THE COURT: All right. Let's call Judge Anderson this afternoon, go down and see-- I don't know if he is at lunch now or not. Get your calendars together, get mutually agreeable dates and understand when your corporate executives are going to be available, and let's start the ball now on settlement talks.

MR. KEKER: Because the corporate executives aren't here, could we make that call to Judge Anderson maybe Monday or something?

THE COURT: That's fine.

MR. KEKER: Give us some time to do it.

THE COURT: Early next week.

MR. KEKER: Okay, that would be great.

THE COURT: All right. Thank you. Have a good weekend.

-----------------------------------------------

I certify that the foregoing is a true and accurate transcription of my stenographic notes.

/s/ Norman B. Linnell
Norman B. Linnell, RPR, CM, VCE, FCRR