UNITED STATES DISTRICT COURT.
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| i2 INC., et al., Plaintiffs, | |
| -vs- | Case No. 1:10-cv-885 |
| PALANTIR TECHNOLOGIES, INC., et al., Defendants. | |

HEARING ON MOTIONS

December 17, 2010

Before: Mag. Judge John F. Anderson

APPEARANCES:

Robert R. Vieth and MaryBeth W. Shreiner,
Counsel for the Plaintiffs

Eugene M. Page and D. Bradford Hardin, Jr.,
Counsel for Defendants Palantir, Sankar and Sinensky

Kevin F.X. De Turris, Counsel for Defendant SRS

NOTE: The case is called to be heard at 11:09 a.m. as follows:

THE CLERK: Case number 1:10-cv-885, i2, Inc., et al. versus Palantir Technologies, Inc., et al.

MR. HARDIN: Good morning, Your Honor. Bradford Hardin and Gene Page on behalf of Palantir Technologies, Shyam Sankar and Asher Sinensky.

THE COURT: Okay.

MR. VIETH: Good morning, Your Honor. Robert Vieth of Cooley with my colleague MaryBeth Shreiner on behalf of the plaintiffs.

MR. DE TURRIS: Good morning, Your Honor. Kevin De Turris on behalf of the SRS defendants.

THE COURT: Okay. All right, well, I have read the various submissions that have been provided to the Court on these two motions. But before I get into that, Judge O'Grady was very concerned that this case hasn't been set for a settlement conference. I got the impression that he gave the parties specific instructions to do that and to do that quickly.

I know that a call was made to my chambers and that I was provided some possible dates. But when I relayed the status of that with Judge O'Grady, he seemed amazed that the parties hadn't done what he recalls having told them to do.

So, I don't know whether you all were planning to

provide the Court with additional information this morning about scheduling a settlement conference, but I suspect you better do that quickly.

Mr. Vieth.

MR. VIETH: If I may address that, Your Honor. The parties have been discussing dates. In fact, we had a phone call scheduled to go over some dates yesterday. Due to the scheduling conference among counsel, that got kicked to today. But we have been exchanging dates.

Today's call is set for 2 o'clock California, 5 o'clock Eastern. So, we anticipate we will be presenting dates to Your Honor on Monday, no later than Monday.

THE COURT: Okay.

MR. VIETH: We do regret not having done that before, but I can assure the Court that there have been good faith discussions. It is understood by both parties that we need to do this.

And as Your Honor was aware, we did contact the Court to get a sense of the process and that we were wanting to present dates. But Judge O'Grady's directive has not been ignored by either side I think in this case, Your Honor.

THE COURT: Okay.

MR. VIETH: So, I do apologize we haven't gotten back to the Court yet.

THE COURT: Well, I got the impression from him

yesterday that there was more of a sense of urgency that he told the parties to do it than it appears, as it has been weeks I think now since he has been-- When was it that he gave you the directive to do that?

MR. VIETH: I believe that was two weeks ago today, Your Honor.

THE COURT: Yeah. So, I encourage you promptly to get a date set on Monday with me. And I will be around Monday. So, you have the basic timeframes of when I am available, I take it?

MR. VIETH: We do, Your Honor. And I don't want to tell the Court that we will-- January 13 is a date that has been kicked around. It is a problem for us. We are possibly looking at the 18th. The 17th I understand is a holiday. We presented those dates. I am not sure the defendants have had a chance to fully scrub those down on their calendars. I think the 13th is the date that they had proposed.

So, just to give the Court a sense, I think we will be back on Monday with one of those dates to present to the Court.

THE COURT: Okay. Well, we will wait until we hear back from you on that.

Okay, let's take up the motion for a protective order first.

MR. VIETH: Good morning, Your Honor. We have laid

out our position in the papers. We do think that there are a number of named parties to the case. I don't, I don't understand the Court's scheduling order to allow each party to take eight nonparty depositions. I think we have had disputes over who was considered a party for purpose of a party deposition as well.

THE COURT: Well, help me with the 35 hours for the 30(b)(6) designees.

MR. VIETH: Yes, sir.

THE COURT: Does that-- And there are two corporate parties on, two corporate plaintiffs, there are two corporate defendants.

MR. VIETH: That's correct, Your Honor.

THE COURT: Is this 35-- And I don't know whether your 35 hours is for both 30(b)(6) designees, both plaintiffs and both defendant corporations or, how-- What was that agreement about?

MR. VIETH: That is a per side limit, 35 hours per side. And candidly, I think we're really looking at i2 and Palantir. And SRS is a corporate defendant, but it is a small company, I wouldn't think there is going to be any issue with respect to that.

So, that is a per side agreement that we struck. And that was after we had the case management order entered. We did think that was a pretty generous amount, we negotiated

that. And Palantir wanted more. We were proposing less. We ultimately agreed to 35, and we are standing by that agreement, of course, Your Honor.

And we had been under the case management order or at least under the submissions that were made in connection with that where we acknowledged to the Court that we were going to negotiate the length of that in good faith. We did strike an agreement.

THE COURT: I just want to make sure that it was 35 hours per side and not per-- I think we need to make sure that things are very clear --

MR. VIETH: We need clarity.

THE COURT: -- going forward in this case.

MR. VIETH: We need clarity. And we are pretty clear on that, that position. I haven't seen anyone really take issue with our assertion of that.

So, I do believe that's the understanding on the 35 hours.

THE COURT: Okay.

MR. VIETH: In light of that, Your Honor, we then-- We just feel some limits need to be imposed here because if we are to accept the notion that every named party gets to take eight nonparty depositions in addition to party depositions, and we may have an argument about that, in addition to the 35 hours we just talked about, and in addition to expert

depositions, it's just too much, Your Honor. And that does seem to be the position that is coming from the other side.

That literally-- I am not sure I can count exactly how many that is. For one thing, they have identified at least ten officers of i2 whom they want to depose and contend that those are parties. That is far more than we thought would be the case when the 35 hours was agreed to and the case management order was entered into.

So, that certainly adds to the burden that we are talking about here. We think this is very wasteful. I think the Court--

THE COURT: How did you come up with the 91 hour time?

MR. VIETH: I can-- I am not sure there is too much science to it, but there is science to it to this degree. We thought, let's just get rid of all the fights over who is a party and whether each party gets the eight nonparty depositions. So, we tried to move away from that concept to avoid those types of fights.

And 91 hours is 13 days. It's relatively arbitrary. I think it's too generous. I frankly kind of regret because even with that proposal, under my calculations that gives us, if you add the 91 and the 35 and if you assume we have two expert depositions, we are looking at 140 hours of deposition per side. That's 280 hours of depositions. That is 40 days,

full days of depositions.

That's our proposal, that's our proposal to limit the discovery in this case. We think that's generous. I am frankly a little nervous the Court might yell at me for saying it is too generous, I could be wrong about that. I honestly don't know.

But that's our proposal. We would like to stick with it. If the Court has other means of wanting to impose a limitation here, that's fine with us. We just think a literal reading of the, at least from the defendants, literal reading of the case management order if you can call it a literal reading, it just leads to many more hours of deposition or dates of deposition than that.

This case is a serious case, it is a relatively big case, but it is not overly compensated, complicated, Your Honor. The numbers of witnesses that have been identified and from whom they want to take depositions is just too many, it's too many, Your Honor.

So, we are before the Court asking the Court to exercise its discretion to put some reasonable limits. We think our proposal is something we can live with. We understand maybe the Court may not like that. There is-- I don't think counting hours is always the best way to go either, but we just thought it was preferable and the best approach to take under the circumstances here.

THE COURT: Okay.

MR. VIETH: Thank you.

THE COURT: Thank you.

MR. PAGE: Good morning, Your Honor. Gene Page on behalf of the Palantir defendants.

I think what Mr. --

THE COURT: Vieth.

MR. PAGE: -- Vieth said here is true, this is a complicated case. And there are lots of other issues than just what they would like to focus on in the case. We have given examples of those in our brief in opposition to this motion.

And I think simply taking a sum of 13 depositions times seven hours, which is how you get to 91, isn't enough. I think if that's five party depositions and then eight nonparty depositions, where you consider any employee that's not at the highest level to be a nonparty to the case, and we don't think given the evidence that we're developing now that that's going to be enough.

We shouldn't be forced to choose between whether we depose someone who can show us that in fact they didn't protect these so-called trade secrets, or someone can show us that they were in fact taking the same sort of information from Palantir, or someone can show us--

THE COURT: Isn't that 30(b)(6)-- Isn't that

30(b)(6) testimony? When you say they, you're talking about the corporation.

MR. PAGE: That's certainly true in the sense that you can get the broad outlines of what happened through 30(b)(6) testimony, Your Honor. But when you get down to specific customers, when you get down to specific instances of whether a trade secret was protected or not, when you get down to specific instances of whether they were taking things from us in the same way they have accused us of taking things from them--

THE COURT: They set up shell corporations and licensed your product?

MR. PAGE: Well, I don't--

THE COURT: I mean, that's the same way. That's what you're saying, right? Do you have any evidence that they did that?

MR. PAGE: I don't agree with the characterization of this being a shell corporation. And the evidence will show something very different. But I think that the evidence will show that they have not legitimately licensed the material that they have taken from us once we have a chance to determine how it is that they have obtained it.

THE COURT: Okay.

MR. PAGE: So, Your Honor, I think that this best result in a concrete situation--

THE COURT: Well, are you, do you really believe that you're entitled to take 40 nonparty depositions? That the defendants in this case are entitled to take 40 nonparty depositions?

MR. PAGE: I think, Your Honor, that it's unlikely that we would ask to take 40 nonparty depositions.

THE COURT: Well, no. That's the position you're taking in this case. You're saying that the order that was entered in this case allows the defendants to take 40 nonparty depositions.

MR. PAGE: We think that's the meaning of the plain language of the order, Your Honor. I don't think that we would actually ask for that sort of number of depositions.

I think, Your Honor, the important thing here is that we have a very abstract dispute where they say, well, we think we should be able to get this done in 91 hours and, therefore, let's have that be the limit for both of us.

And I think if in fact we ask for depositions and they come to us and they say, this person doesn't know anything about anything, and we would like not to have that person taken; or, frankly, this is an Apex deposition, that the person knows not enough in that regard either, we can have that dispute and we can discuss that and we can work it out.

What's happened now is they just say, we would like to limit you from taking full and fair discovery in this case,

period, without any specifics as to particular deponents or particular--

THE COURT: And they are trying to avoid the particular deponents issue by giving you a reasonable number of hours and let you pick and choose how you want to spend those hours.

MR. PAGE: Well, Your Honor, we don't think that really 91 hours outside of 30(b)(6) depositions is anywhere near reasonable for a case of this magnitude. We have multiple, multiple different issues to be dealt with. Their trade secret theft from us. Their damages. Their breach of the MDA between the parties when their previous corporation COPLINK merged with i2 Corporation. That's just not something to deal with with a total of 13 depositions, which is what they are proposing.

THE COURT: It's hours, it's not numbers. And that's so, you know, if you take a two-hour-- You can take, you know, three two-hour depositions in a day and it still only counts as, you know, six hours as opposed to three deponents.

MR. PAGE: Understood, Your Honor. And certainly we would try to be economical with depositions. We have no need to take seven-hour depositions of everyone. But 91 hours it seems is not going to be enough to get through all of the people that we need to talk to figure out what it is that they

have done and how it is we rebut these damages theories.

You will see them in the motion to compel where they are saying that everything we've sold is somehow something that we owe them money for. We don't think there is any legitimate basis for that. And we think if we're permitted--

THE COURT: Well, everything that you sold that has their alleged information in it. Not everything that you have ever sold. So--

MR. PAGE: Well, I think there's a complication to that. We can talk about that during the motion to compel.

But the point being that we don't, I think, have enough time in 91 hours to really examine all of the people who have spoken with their customers, who have found reasons that are other than anything we have done that shows that their business has been going down for quite sometime now and that this is actually just an excuse to try to get around that.

We need sufficient time to take their testimony in order to rebut those damage theories as well, Your Honor.

THE COURT: And you understand the discovery cutoff date in this case is what, March--

MR. PAGE: It is in March, Your Honor, we understand that. And we are, we are moving forward. There is a deposition commencing in probably an hour on the west coast right now. And we have others next week, the week after that.

And we are not taking time off for the break between Christmas and New Year's, we have got things going on all the time.

So, we are well aware of the discovery cutoff and we are moving expeditiously. Unfortunately, because this motion has been filed, we have had to change the sequence in which we took these depositions because we couldn't take the lower level people to begin with and then end up finding out that we didn't have enough to get to the top level people. And that's something that has affected our schedule--

THE COURT: Well, what authority do you have to support a position that if you name an individual and want to take an individual's deposition, that that doesn't count towards the nonparty limitation?

MR. PAGE: I think, Your Honor, that's the case that we cited in our opposition--

THE COURT: That's where the person has to show up. And that's a different question as to whether the person has to appear in the forum.

MR. PAGE: Well, I believe, I believe the person has to appear on notice if they are an officer, director or managing agent.

THE COURT: Right.

MR. PAGE: And I think that the dispute that we have very nascent with the i2 folks is whether a lot of these high level people with titles like senior vice-president are in

fact managing agents. We would think that they are.

Obviously, we don't have, you know, the information that they do about their exact job, goals and responsibilities, but we think that the classification they're making of people being nonparties doesn't strike us as necessarily reasonable either.

THE COURT: Well, their position that they are taking at least here is that they are nonparties towards the counting of the eight nonparty nonexpert limitation, right?

MR. PAGE: I believe that's correct, Your Honor.

THE COURT: And I am trying to get some sense from you as to why you think that isn't an appropriate argument to make. They are not parties, you know. Sally Jones is not a party to a lawsuit. And if you want to dispose Sally Jones in her individual capacity, why does that not count as a nonparty deposition on the limitation, on the number limitation?

MR. PAGE: Your Honor, I can imagine that's true if Sally Jones happens to be someone who answers the phones at i2 Technologies. When Sally Jones happens to be the senior vice-president of sales, it's a bit harder to say that she is not a managing agent and she is not in fact--

THE COURT: But I am trying to get from you why you think just because someone maybe a managing agent, that in and of itself qualifies towards counting as a party deposition?

MR. PAGE: I think--

THE COURT: The number counting. Maybe the location, I know the argument as to the location of where the depositions may have to be taken, but in the numbers of depositions.

MR. PAGE: I understand, Your Honor. I think that the answer would be that a party deponent is someone who can be produced or is required to be produced upon notice. And I believe that managing agents must be produced upon notice as well as opposed to by subpoena.

THE COURT: Okay.

MR. PAGE: I am not sure if you have any more questions.

THE COURT: Well, no, I don't think I do. Thank you.

MR. PAGE: Thank you, Your Honor.

THE COURT: Mr. Vieth, anything else you want to say on this motion?

MR. VIETH: Your Honor, there was a concern about sequencing of depositions that was mentioned. Certainly by filing this motion we aren't trying to disrupt anything.

Our proposal allows for sequencing in any manner possible. And it has been my experience that with the deadlines in this court, it is very difficult to try to arrange and hold to a sequence of depositions. We have just got to get it done.

Your Honor, neither party seems to know exactly what the Court means when it says party. I am happy to have a 30(b)(6) deposition. Of course, that is a party deposition. Other employees, we don't know for certain. And that may be surprising to the Court because I have been practicing here for a while, but I have been unable to find a lot of guidance on it. And that's, frankly, why we resorted to the proposal that we did.

And as Your Honor correctly pointed out, if there are a lot of witnesses who have a couple of e-mails, it may not take all day and then we could fit it in that way. But if we want to slice and dice the party proposals some other way or do it in terms of days or whatever, we are open. We just need some limits, we need some discipline on the deposition process, Your Honor.

THE COURT: All right. This is an interesting case. And when I was practicing, I never found much guidance as to how you count party depositions from the court, and have found that the court tries to defer making hard and fast decisions in that regard to hopefully let the lawyers work things out on their own as to whether this person should or shouldn't count as a party deponent.

And I'm persuaded in the motion here today that maybe an alternative position is appropriate in this case, not counting numbers of depositions, but setting a limit as to the

number of hours. I think it will provide some limitation that should be a reasonable limitation for the parties, for each side. I guess I should be specific in this, as to each side. And that each side will know the number that they have going forward as to what they can and can't do and will focus their attention as to who they think is appropriate and will make whatever depositions that are taken efficient in that they won't spend a lot of time going, rehashing matters that necessarily may not need to be done because they know that that time will count towards the ultimate limit that each side will be having.

So, under that circumstance, and this is so that we are all clear, that each side will be able to take 30 hours of 30(b)(6) testimony of the other side. And that is direct questioning. That is, if there is any cross-examination, that doesn't count towards the 35 hours of that. Which I think is the agreement that the parties had negotiated and reached.

So that each side will be able to take 35 hours of 30(b)(6) testimony from the other side. So, if for one reason or another both the i2, Inc. and i2, Limited get deposed, that 35 hours is to both of those. And the same for Palantir and the SRS, 35 hours to do 30(b)(6) depositions for both of the corporate plaintiffs and both of the corporate defendants.

This doesn't count experts. So, experts are not in this equation. So, expert depositions are outside of the time

limitation that we are going to set here today.

And I think under the circumstances of this case, you know-- And again, there is no perfect way of coming up with the number of hours. But I think giving you the number of hours now and then you work around it is the best way to do it. I am going to set it at 100 hours.

You know, if you need to have some explanation as to why, I really, I think that is more than enough hours for the parties to conduct any discovery that they need to do in this case.

It will alleviate the potential for arguments over who is a party and who is a nonparty as well, you know. And so, you know, to the extent those issues arise and since we have both claims and counterclaims in this case, you know, each side would be obligated to produce party deponents here in the Eastern District of Virginia. You know, that's something I hope the lawyers can work out because scheduling depositions is not something that I like to get involved in if I can avoid it.

So, you know, while this ruling today will short-circuit some arguments as to who is a party and who is not, you have still got the issue of where the people have to appear if noticed, whether they are an officer, agent, officer or managing agent or director.

So, I am going to grant the motion to compel. I am

going to grant the motion for a protective order in part and provide a limitation of 100 hours of depositions. And this is going forward. So, whatever is-- It's only been a 30(b)(6) so far, is that right?

MR. PAGE: Your Honor, there has been one percipient witness deposition of an i2 witness this past Tuesday as well.

THE COURT: Okay. Well, this is 100 hours going forward, I am just going to say now. I think the time limitation is something that, you know, I want to give the parties fair warning of. And you now have warning, it's going to be 100 hours.

MR. PAGE: For clarity, Your Honor. Saying going forward, that means that the hours expended on Tuesday's deposition do not count against the 100 or--

THE COURT: They do not, that's right. What happened, whatever goes forward, starting from right now. So, the deposition in California is started now, that time limit on that will count. But nothing before this morning will count.

MR. PAGE: Thank you, Your Honor.

THE COURT: Okay. Okay. Anything else on that motion?

MR. VIETH: No, sir.

THE COURT: Okay. Let's deal with the motion to compel now.

MR. VIETH: Good morning, Your Honor.

Your Honor, I know in the past you have preferred to go one by one. I do think there are a couple of things that might apply to a number of these though. Your Honor, it is-- We don't feel we have gotten the revenue information that we are entitled to or that we have asked for. We have gotten only redacted annual financial statements on a consolidated basis for 2008, 2009, I believe, I may have the years wrong there, but with footnotes redacted and that sort of thing.

The footnotes speak to revenue recognition policies, perhaps. Perhaps. We don't know. Perhaps they disclose information about future revenues.

We think that is something that just is not inseparable here. There may well be an allocation exercise. Mr. Page informed the Court that we think all revenue that they got from any Palantir Government is appropriate. I guess we don't know enough to say one way or the other on that, but it is clear there is the potential for allocation here of revenue. And, therefore, we need a lot more information that can help the parties deal with that, that important issue.

I am sure they are going to take the position that we are not entitled to all that revenue under an unjust enrichment theory or other theory perhaps.

Your Honor, there is another issue that might affect a number of these, is that this is software that is sold most

ways. I am sorry the Court is aware, often there is ongoing maintenance and support. We don't know when that revenue is recognized.

We also-- If it's not recognized in the current year, there is still, it's still a real number in terms of the damages analysis. And so, forecasts and the like we think are squarely at issue in this case.

In addition to that, the evidence is unclear on this, and we might know a little more as a result of today's deposition, but there are, there are at least suggestions in documents that have been produced and from other sort of intelligence in the marketplace that Palantir is offering free pilots or perhaps even loss leader type of pricing for some of their products that would suggest that the actual revenue numbers are not the true value of what's being marketed. And that's another reason why forecasts and business plans and the like are going to have direct bearing on damages issues before the Court.

And sort of the final global point I would like to make before we take these up one by one is that Your Honor did impose a limitation the last time we were here on the customer contracts. And we heard the Court, and I don't agree with Palantir's suggestion that that ruling carries over to much of what we have here today. They are making that argument. But I do think--

THE COURT: Well, document number, the second document, the second set of document requests, number 6, you've withdrawn your motion, which is the one having to do those contracts, is that right?

MR. VIETH: We do, Your Honor, we do.

THE COURT: Okay.

MR. VIETH: But Your Honor suggested that we come back with some assistance from a damages expert to explain the relevance of things. I am concerned that now we will be back. We did not know, we thought that given the production that is at issue in this motion that really didn't come in until this week, and frankly we didn't understand the defendants' position until we got their brief Wednesday night, it looks like we might have to be back. Although depending on rulings today, maybe, maybe not. But I guarantee you we will be able to make an argument that I think will convince the Court that we are entitled to discovery that is a little broader than what Your Honor ordered last time to the extent it is even relevant to some of this today.

We thought that dispute would be narrowed at least. And, frankly, it now looks like it may be expanded because of the position being taken by Palantir. And, frankly, today's deposition might shed some light on that as well because one thing that we hope to learn a little bit is how extensively the use of the trade secrets has been used in the Palantir

products. There has been a lot of talk about the importer. And that has been the source of the limitation that the Court has adopted. It has become--

THE COURT: I only adopted that on what contracts that had to be provided.

MR. VIETH: I understand, I understand that, Your Honor. And I am just concerned that that whole concept may be out the window as a result of today because we don't know for sure, but it is quite possible that it is more than just an importer product. There are references to other functionalities in the Palantir system, and we don't know if those were derived with trade secrets or not. We are actively pursuing discovery on that. We don't know how much light will be shed as a result of today, but I just want to signal that for the Court.

With that as a background, Your Honor, I am glad to take these one by one.

THE COURT: Well, the second set, the range from 13 to 20, tell me where we are on whether that issue, the issues involved with those requests have been resolved or not.

MR. VIETH: Your Honor, I need to take one moment because--

THE COURT: Your reply indicates that you haven't gotten some--

MR. VIETH: On that, Your Honor, I do not, I am not

able to confirm that we have gotten those or not. I see Mr. Page is standing up, maybe he could help us with this.

THE COURT: Mr. Page says that you have agreed to do it or you have done it. And I think in your reply your response was, you know, they haven't provided you with the same representation that they did for document request number 6.

MR. PAGE: Your Honor, I did see that yesterday when they filed their brief. And I contacted my team back in San Francisco, and they told me that in fact the production for 13 to 20 has been completed.

THE COURT: Okay. So, based on Mr. Page's representation that he has done the production for 13 to 20, I will take that as the issues in those have been mooted.

MR. VIETH: Very well, Your Honor.

THE COURT: Okay. All right. So, now let's, I guess we can start in on the-- And while I, I don't enjoy it, I think it's really the only way that we can do this is deal with things. And what I-- You know, you have grouped them to some extent on topics in your opening papers that I think are probably the appropriate for us to try and deal with them to some extent as individual requests, but under the rubric of dealing with that topic.

So, we talk with, I guess where we were on pages 8 and 9, the sales and revenue requests.

MR. VIETH: Yes, Your Honor. The first one, request number 16, it's a little unclear to me exactly what Palantir has here. I think their position is they don't have anything responsive, but what they really say is they don't track revenue exactly this way.

And so, here is where I think we-- If the revenue is not tracked this way or not broken out appropriately, it seems to me at a minimum we need to get the full revenue. And I think monthly financial statements at a minimum unredacted would be the starting points here.

But I also think, and I don't know for sure, but I suspect they have a way to in a software program break down revenue by product. Perhaps not.

It may be that every dollar received from Palantir Government is covered by this. In other words, the importer product may have been in every product out there until quite recently when we understand it's been, it's been removed and it's now offered as a plug-in. But I just don't know that for certain if it is every Palantir Government product.

But as I said earlier, if there is going to be an allocation exercise, at a minimum we are entitled to the basic financial revenue documents. And I assume there has been monthly reporting, we don't know that for certain, but they certainly have got audited consolidated financial statements for year end. I would be very surprised if they don't have

them monthly.

THE COURT: Okay. Why wouldn't that be an appropriate document request?

MR. PAGE: Your Honor, if I could just address what Mr. Vieth started out with. I think that would be helpful.

THE COURT: Come to the podium.

MR. PAGE: I think that would give some context to this.

I think, first of all, it's not true that we have produced nothing but our audited financials. We have in fact produced contracts and other raw materials from which all the information about these sales to customers who have used the Analyst import functionality can be derived.

So, that financial information is out there. It's not just the financial statements that have been produced.

And those financial statements were not in fact called for by any of their requests. That's part of the, part of the source of this problem, Your Honor. You can see what they've done in requests like request number 16, is to ask for things that are kind of argumentative. Like, give us all the documents that relate to what money you have gotten by taking our stuff. Right.

They never asked us for, please give us your audited financials. Please give us your quarterly financial statements. Please give us normal financial documents of the

sort that we asked them, for them or from them in our first set of requests.

So, that's why we have an issue with what they have been asking for is not something we have.

Now, on Tuesday they finally served us with discovery requests saying, please give us your audited financial statements, please give us your statements of revenue, so on and so forth--

THE COURT: Well, why wouldn't document request 7, documents sufficient to show gross revenue from the sale of Palantir products, why wouldn't that part of the financial statements? Is it because you don't break it down by product?

MR. PAGE: They are not broken down by product, Your Honor. You can see that in the financial statements we have produced.

And that's exactly why we've produced them, because they haven't been called for, we just wanted to make a showing of good faith to i2 that we are not just whistling Dixie here when we say that these things aren't broken out in our ordinary audited financial statements. Here they are, here is how we produced them. And you can see that in fact what we are presenting is true based on that.

So, part of the problem here is that what we've gotten is a request for many sort of odd and argumentative types of documents as opposed to just asking us for the

financial statements that they now say they want. If those had been propounded sometime ago, we would have had a discussion on that and produced, you know, what's appropriate based on our discussions.

Instead what happened was they sent all of these things. Didn't meet and confer with us. I mean, they sent a letter in response to our October 21 requests on November 16 to which we responded.

And then last week on the 6th, the Monday after our hearing hear on December 3, we got a letter saying, please produce all of these documents immediately or we will move to compel on Friday. Which was not conducive to, frankly, meaningful meet and confers despite the fact that we were on the phone with them many times trying to figure out what sort of compromise we could reach and did in fact produce things on an expedited basis as a result of that meet and confer process.

But the fact of the matter is we just haven't been asked for these things. And until they started talking to us last week about our objections, we didn't know what it was we should be producing because they were asking for things we don't have.

THE COURT: You don't have documents that relate to the sales of Palantir software to customers that were already using or had purchased i2 software?

MR. PAGE: No, Your Honor, we do have those. And that's exactly what we have been producing in response to numbers 13 through 20. I understand that's kind of confusing because they have renumbered starting with set 2. So, set 2, 13 through 20 --

THE COURT: Right.

MR. PAGE: -- is actually responsive to set 1 request number 20 because those are the customers who have used the .anb import functionality. And we have been producing those documents in response to those requests, and they are in fact responsive to set number, request 20 as well.

Now, the question of whether, you know, all of the things that are in number 20, in other words, everyone who might have used i2 software, been an i2 customer at sometime, but never used the .anb import functionality, should be produced under request number 20. We think that's going beyond the scope of this case based on Your Honor's rulings both last week and, frankly, on October 29 when we had come in asking for i2's financial statements. And Your Honor said, no, what you need to produce are the financial statements you have that relate to this case. In other words, the Analyst Notebook financial statements.

And so, they produced something that was sort of created for purposes of litigation in the sense that they went through, made a spreadsheet or had their financial officer

make a spreadsheet of that sort. It's not their whole financials that we--

THE COURT: But the problem that I am having with your position is that, as I understand it, the Palantir software as sold prior, in the past, say last year, had a component to it that they claim was developed after receiving their trade secrets, misappropriating their trade secrets.

MR. PAGE: I understand that to be their allegation, Your Honor.

THE COURT: Is that right?

MR. PAGE: Yes.

THE COURT: And so, you know, to some extent whether it was used or not, it was a component of the system that was sold, right?

MR. PAGE: That's correct.

THE COURT: So, why isn't that the revenue that you get from selling a product such as that at least arguably relevant for some damages related purposes?

MR. PAGE: I think, Your Honor, because the test in the marketplace shows who actually used it or not. And that will tell you whether or not the reason they were buying it or any reason they were buying it was because it had that functionality.

Now, I see some material in the reply papers saying, well, it was advertised as having this functionality or set

forth as having this functionality. Well, I have not seen any evidence, frankly, that we're out there touting this as being the, you know, reason to purchase our software. There is a lot more to it than that.

And the fact of the matter is if they haven't used the functionality, it's just not conceivable the reason they were buying it was to get functionality they didn't use. And if they weren't buying it for that reason, there is no reason to believe there is any damages associated with it.

THE COURT: And how do you know that they have not and will not use it?

MR. PAGE: Sure, happy to address that, Your Honor. Palantir is not a company like i2 that sells software on a disk and sort of says, go off and do your own thing.

THE COURT: I know, you have a server and you provide an employee or--

MR. PAGE: Correct, we have what we call forward deployed engineers and embedded analysts who work with these customers. And they are aware of the sort of data sources that those customers are using because they are very involved in making sure that the, you know, data sources are properly brought into the Palantir system, giving any help on those sorts of things.

And so, we have done an extensive investigation to determine where it's possible that the .anb import iBaseCrawl

functionality was used. And we have given them that in every instance, including where it is just kind of a few dribs and drabs here and there. If it was used, then we have identified those customers and produced their information.

THE COURT: And what type of revenue information do you have for the sales relating to these products? I mean, I got the sense from what your opposition said, and I couldn't really get a firm sense as to what it actually is that you are able to tell them as far as sales of products and revenues.

MR. PAGE: I think we can tell them to whom they were sold. I think we can tell them the price and the sort of contractual terms that go with that sale.

I think that in preparation for the 30(b)(6) deposition next week, we'll be producing something similar to what Mr. Carter, their chief financial officer, produced to us for his 30(b)(6) deposition that shows sort of consolidated numbers for those customers. And they can examine on those numbers.

THE COURT: All right. Let me-- I think I understand Mr. Vieth's position on most of these individual requests, but I need to hear from you as to why 16, the documents and communications relating to revenue that Palantir has obtained in whole or in part because of its ability to import data from current or former i2 customers.

Why wouldn't that be relevant information in this

case?

MR. PAGE: I think if in fact it were something we could determine or prove that these customers gave us this revenue in whole or in part because we had this functionality, that would be something. And to the extent that information can be derived from documents that show what was paid by customers that used the functionality, that information has been produced.

THE COURT: I take it the same with number 20, 20 is--

MR. PAGE: That's correct, Your Honor.

THE COURT: Well, I mean, I think the way that both 16 and 20 are worded, and we're talking about set 1, requests 16 and 20, that the information as it is requested in those two document requests is arguably relevant to the damages issues in this case. And that to the extent that you have that information, that information should be produced.

So, I am going to grant the motion to compel to document request, set 1, document requests 16 and 20 to the extent that that is information within your possession, custody and control.

MR. PAGE: Your Honor, I would like to understand with respect to 20, if I may.

THE COURT: Okay.

MR. PAGE: That, it seems to me, goes beyond simply

the documents that relate to customers who have used the .anb import functionality and requires us to produce all documents referring or relating to the sales of Palantir software for any customer that we have some reason to believe was used or had purchased i2 software. I am not sure how we get to that latter part, but I want to understand that's what Your Honor is ordering.

THE COURT: It is. Because if-- While they may not be using it now, they may be using it in the future. Or they may, if they had i2 software, they may have thought of that as a benefit in buying the product.

And so, I think an argument can be made that certainly for those customers that had i2 software, you know, that buying the Palantir product that allowed for importability of that, whether your person on the ground has actually done it or not, you know, an argument could easily be made that that would have been one of the reasons for going to the Palantir product, either for immediate use or use in the future or given the option to do it.

So that I do think that the information requested in number 20 is appropriate.

MR. PAGE: Your Honor, could we get a list from the i2 people so we know who we are supposed to be looking for here? Is that something that would be possible?

THE COURT: Well, I think under the circumstances,

you know, to the extent that you know that these individuals or companies either had used or were using, had purchased or were using i2 software, that's what you need to do.

I take it Mr. Vieth isn't anxious to provide you with the customer list of everybody, is that right?

MR. VIETH: I believe one has been produced already, Your Honor, so I don't think that's an issue.

THE COURT: Okay. Well, you know, to the extent that you have that information as to who is either using or has purchased i2 software, you need to use that information in responding to that request. Okay.

MR. PAGE: Understood, Your Honor, understood. My only concern is that if we have a list of this sort, we are asking our client for, you know, documents relating to X, Y, Z and A, that's going to reveal who they're telling us these people are, but that's--

MR. VIETH: That's okay with us, Your Honor. Under the circumstances, I think they have a pretty good sense as they have already told us.

THE COURT: Okay. Documents sufficient to show the gross revenue from the sale of Palantir products, including the iBaseCrawl and Palantir Government applications.

Mr. Vieth, why all products? Why is that appropriate as opposed to the Palantir Government or the iBaseCrawl? You have got--

MR. VIETH: We will limit it to that, Your Honor. This request was drawn up before we knew as much as we do today. I think Palantir Government, probably it's my understanding that that encompasses everything here.

THE COURT: Okay. So, why wouldn't they be entitled to least documents sufficient to show the gross revenue from the sale of the Palantir Government product from 2006 to the present?

MR. PAGE: Well, Your Honor, it comes from our discussions on October 29 and December 3 where we understood this case was limited to actual revenues that might have been part of a customer that is interested in the .anb import product. And so, we think that's the appropriate revenue number to be producing.

THE COURT: Okay. Well, my ruling on that request was as to what contracts had to be produced. I wasn't making a global ruling pursuant to a motion for a protective order as to limiting all discovery in this case.

So, I think you may have read too much into that one ruling on a specific document request. I did not rule there that all discovery relating to any sales on products that were not actually using the importer function was off limits.

MR. PAGE: Understood, Your Honor. That was not just that ruling, but also a ruling on the previous motion to compel that we had brought for financial information that led

us to believe that would be the appropriate limitation on the scope. But I understand Your Honor is saying that is not correct.

THE COURT: Right.

MR. PAGE: So, I appreciate that.

THE COURT: Okay. Well, I think, you know, providing them with the gross, documents sufficient to show the gross revenue from the Palantir Government in January 2006 to the present is appropriate. So, I am going to grant the motion to compel as to that request.

Mr. Vieth, why isn't 58 close to the same thing as what I ruled in number 6 on the limitations?

MR. VIETH: It is close, Your Honor. I think 58 is requesting more of a list. 6 was requesting the contracts. That's the only, frankly, principal difference I can explain to the Court, but I do think the list would be helpful, Your Honor.

THE COURT: Well, I don't think that-- Actually, I think my earlier ruling on 6 really controls number 58 to some extent. I think that the, who the active people are and things like that, at least at this point-- You know, again, I may end up having to revisit that. But to the extent that my ruling on 6 is going to stand to deny the motion to compel set 3, request 58.

And I guess that would also apply to 59, is that

correct? Is there any reason why it wouldn't apply to--

MR. VIETH: I can't think of any reason to argue with you right now, but I would want to reserve the right to come back per Your Honor's earlier directive.

THE COURT: All right. So, 59 and 60 I think are the same as what we have just talked about.

Let me, I thought I had already ordered the documents that would have been responsive to the third set, request number 61. Why is that at issue here today?

MR. VIETH: Your Honor, the only way that I think I can respond to that is I don't recall a specific ruling. I know that there have been a few rulings that have been close to this, but we certainly, we do think that we are entitled to that information.

THE COURT: The contract, I guess maybe it was the contracts and not necessarily the installations, is that the difference?

MR. VIETH: And--

THE COURT: I mean, the terms and conditions of the contracts-- I mean, my ruling, if I recall this correctly, was to the extent that there are variations among the contracts, you had to produce, you know, the different variations, but that the contracts themselves had to be produced.

MR. VIETH: Your Honor, this is intended to pick up

things that may not be the subject of a formal contract. Things where a-- So, it's terms. There may not be revenue. We just don't know.

And this request is phrased not knowing exactly how Palantir distributed its products to every customer or reseller. And so, we are trying to make it broad to pick up that sort of thing, documents sufficient to show the terms under which there has been, this product has been distributed.

That's what we are driving at. It could conceivably be broader than customer contracts, maybe it's the same universe of customers or installations, but we just honestly don't know.

MR. PAGE: Your Honor, I don't claim to understand what they were asking for sure there. But I will note that request number 61 specifically refers to entities that are not the customer.

So, I'm not sure how this is going to damages. I mean, Mr. Vieth is telling you there is no revenues involved. They are not customers of ours.

So, I think that's the distinction they are drawing, but it seems to me it wouldn't fall under number 6 because not only are these people not using the thing necessarily, they are not even our customers.

MR. VIETH: Your Honor, if there is some sort of trial basis usage, and I think we are entitled to know that,

it would an act of infringement. We think it could lead to a potential sale.

I don't know exactly what has been going on out there, but they may not consider that entity a customer if there is no revenue coming in from that user. That's what we're seeking.

THE COURT: Well, I am going to grant the request for number 61, but on the same basic conditions that I did the contracts. That is, to the extent that you have various installations that you have done to noncustomers, and I don't know whether there are any or not, but to the extent that there are terms that you agree to do that, and they are basic terms, that for everyone that you need to at least provide that. But if there are variations of that for different installations, then you need to provide each variation in response to that request.

MR. PAGE: And, Your Honor, this is subject to the same limitation as your ruling on number 6 where noncustomers in this case who don't use the .anb import function or the iBaseCrawl function are not included, correct?

THE COURT: No, because my limitation on the contracts wasn't just on those who used it. It was on the sales of the Palantir Government product completely. It wasn't that you had to produce every single contract, but you had to produce the versions of the contract that provided for

the sales of Palantir Government.

So, I am not limiting it to installations where these third parties necessarily used the importer function, but were provided with the software in which they could have used it at some point.

MR. PAGE: I think I understand, Your Honor. So, you are talking about forms of the contract that are used for that sort of thing?

THE COURT: That's right.

MR. PAGE: Not all such contracts--

THE COURT: Not all the contracts, but the term, the documents that show the terms. That is, the basic terms in which that would have been provided.

MR. PAGE: Thank you, Your Honor.

THE COURT: Okay. Mr. Vieth, let me hear from you on 65 and 68.

MR. VIETH: Your Honor, 65, again this gets to the issue of professional services, which often go hand in hand with software sales or licenses. And you will see this request is designed to pick up all documents sufficient to show they paid professional services whether or not it was done separately or as part of the customer contract.

THE COURT: What do you mean by paid professional services?

MR. VIETH: Well, where would--

THE COURT: That was done by Palantir employees. I mean, that basically is you want to know every installation of Palantir Government, right? This relates to every person, every person who had anything to do with paid professional services for either the installation or operation of the Palantir Government applications?

MR. VIETH: I think that's correct, Your Honor. And we suspect it's all part of one contract, but we just don't know. They often go hand in hand, as I say.

And they are also, Your Honor, for all we know, part of these integration services may well achieve the interoperability with i2 functionality that is at the heart of the case.

So, we do think that type of revenue and the contracts underlying is relevant.

THE COURT: Why shouldn't that be limited to those who have used it, the importer function? I mean, you're asking for specific information about the professionals' work we've been doing. So, I mean, that's more customer contract specific information, am I correct on that?

MR. VIETH: If I understand Your Honor correctly, the question, I think you are correct, Your Honor, it's similar.

But do I understand Your Honor's question to me is should that be limited to customers who receive the importer

functionality--

THE COURT: Or should it be received it or used it? Why shouldn't be it limited to those who have used it since you are asking for such specific customer-related information as to, you know, the professional work done by the employees who are that specific installation.

MR. VIETH: Well, if they are claiming to do the, do some of that integration in the future under a long-term contract, I do think that would be relevant, Your Honor. And we just don't know how these contracts were structured.

I also think, I guess this issue may not come up directly with this particular one, but I think Your Honor clarified that your ruling on request number 6 was not limited to customers who actually used it, but rather customers who received the importer functionality. That's how I understood Your Honor just to clarify your prior ruling and applied it here to some of today's rulings as well. And we think that is appropriate because Palantir--

THE COURT: No.

MR. VIETH: Maybe I missed something.

THE COURT: I did not revisit number 6. What I recall having ordered done is the specific contracts that relate to sales for those who have used the product need to be produced. I mean, used the importer functionality. Those contracts need to be produced and have been produced, my

understanding, in response to document request number 6.

I also seem to recall having ruled that there are other customers of Palantir Government who have not used the importer functionality. And to the extent that there are contracts that relate to those sales, that at least the terms of those contracts have to be produced. And to the extent that those terms are different, then, you know, the various versions of those contracts have to be produced. Okay.

MR. VIETH: Understood, Your Honor, thank you. I appreciate that.

THE COURT: All right. Well, I think for document request number 60-- Well, let me hear from Mr. Page.

MR. PAGE: Briefly, Your Honor. I think you have identified exactly the right issue here. Which is that they say integrate Palantir's Government application with any other software or database program.

Which means, you know, getting ready for Microsoft Excel integrative, what's going to be BAH gains (unintelligible) with a couple things. And we think that Your Honor's suggestion that this be limited to integration with the i2 products is correct.

And I would think those sorts of documents have been produced, but if they have not been produced, then certainly we will make that production.

THE COURT: Well, I am going to limit set 3, request

number 65, to those applications which have actually used the importer functionality.

MR. PAGE: Your Honor, a brief point of clarification on your discussion of number 6 here. When you said different terms, I assume the different terms doesn't include the price terms.

THE COURT: No. It's the basic terms of, you know, what's going to be provided, the license agreement, what the agreements actually are. Not the prices.

MR. PAGE: Thank you, Your Honor.

THE COURT: Okay. The customer list and licenses information. Mr. Vieth, why do you want that?

MR. VIETH: Well, Your Honor, I can't really-- I think we may have covered this in some of the other requests where I made this argument to you. Your Honor has denied those requests. And I won't--

THE COURT: Yeah, I mean, all of Palantir's customers or licenses I think is overbroad. I don't think that's-- That is one that I am going to deny your motion to compel on that one.

Okay. I guess we will, why don't we move to the next grouping that you have, the sales forecast requests that are I think in the third set, numbers 64 and 66.

MR. VIETH: Yes, Your Honor. And here, again, there are suggestions in the documents and elsewhere that we have

heard Palantir is, not surprisingly, it's a relative new product, they have done test programs and the like and still are doing that sort of thing where there is no charge or a low charge.

Therefore, the pure revenue numbers we don't think are going to tell the whole story. Even if the pure revenue numbers accurately match the value that has been delivered to date, we do believe many of these contracts are long term or we suspect they might be long term and they might provide for ongoing services.

Therefore, we think forecasts are right at the heart of this damages inquiry, and that's why we think we should be entitled to request 64 and 66 as we prove them here (unintelligible).

THE COURT: Why wouldn't those sales forecasts and plans be appropriate?

MR. PAGE: Well, Your Honor, what I heard Mr. Vieth say is that they are entitled to them because there might be terms in the contract that give you some sort of a forward boost or something like that. They are getting those contracts from customers who have used the .anb functionality. So, that's taken care of.

And as to any other customers, you know, future revenues for people who haven't used it, haven't shown any intention of using it, aren't relevant. Especially,

especially given that our product is going to have the .anb import, does have the .anb import removed as it is shipped now. And iBaseCrawl has been gone for probably over a year now.

So, the going forward numbers there couldn't possibly reflect anything that comes from alleged use of their software because it's not in the product anymore.

THE COURT: Well, but they're not talking about just forecasts that you have today for sales in the future. They're talking about, you know, forecasts in the past about what you would be, the marketing efforts that you would be making to sell this product. And I assume there may or may not be references to the ability to import data from i2 and things like that.

So, why-- I'm not convinced that it's not relevant information. So--

MR. PAGE: Certainly, Your Honor, if there are forecasts from the past, that would be one thing. But I think forecasts going forward are a completely different beast.

THE COURT: What time frame are you talking about, Mr. Vieth? I guess in 64, it doesn't appear to be any time frame that is actually designated there.

And then 66, would you be willing to limit it to the time period where they-- What time period do you want to have in 66?

MR. VIETH: Your Honor, I think January 1, 2006, is the appropriate starting point. But I do think carrying it up to the present or pretty close is appropriate.

If the forecasts show a drop off because they are no longer offering this product, that is relevant information. And that's why financial information is different in kind than you're your ruling on request number 6. In our view, trends are hard to discern when you limit the universe of production to the actual products at issue.

So, we do believe it is appropriate to carry it up to some deadline, maybe December 1 of 2010 or something that is pretty close to the present day.

THE COURT: Well, I am convinced that the information that is requested in document request, third set, 64 and 66, is relevant information. And I will limit the time period from January 1, 2006, to December 1, 2010, to the extent that that information is available.

MR. PAGE: One point of clarification, Your Honor. On 66, we have been talking a lot about sales forecasts, revenue forecasts. Enough so that the company valuations, I don't know that they argue those are relevant. I am not sure they are. And I am just wondering whether Your Honor is granting the motion as to that argued portion as well.

THE COURT: Well, I think that to the extent that you're making forecasts that refer or relate to revenue

derived from the Palantir's Governmental, the Palantir Government product, that it's appropriate to, if you're touting this as this is going to be the big money maker back in 2008 saying that we're going to make a lot of money out of this product now because we've got this importer functionality and we have opened up a new market to sell it to and so you should invest in our company because of that component of our new product, that's relevant kind of information.

So, I do see that there is arguably some, the possibility of that having relevant information, but it does have to refer or relate to the revenue derived from the governmental application or iBaseCrawl. So, it has got to have some relationship to that.

MR. PAGE: Some relationship to the use of the importer, Your Honor, or just to the Palantir Government program period? Because that's sort of the entire universe there.

THE COURT: Well, I am going to keep it as it's worded. I think it may be a little too difficult to split the hairs on that one.

I think any information that is provided to actual potential investors that refer or relate to the revenue that relates to the Palantir Government, because I think they are going to say to some extent that is going to be relevant information at the time. I haven't made an ultimate decision

on that here today, but I will grant the motion to compel both request 64 and 66.

MR. VIETH: Thank you, Your Honor.

THE COURT: Mr. Vieth does that leave any others unresolved?

MR. VIETH: I have request 81 on my--

THE COURT: 81, yes. Okay.

MR. VIETH: Your Honor, which seeks proposals and requests, request for proposals or solicitations, Your Honor. And the limitation that Palantir proposes to put on that are ones that explicitly reference i2. It's quite possible the word "i2" does not appear in the proposal and the solicitation that it's competitor Palantir is involved in.

So, we think that is an inappropriate limitation on this.

MR. PAGE: Your Honor, that was the suggestion we made in our responses to their third set of requests. We have never had an opportunity to meet and confer with them about it substantively.

I think on our, page 14 of our opposition we don't say that the explicit reference to i2 is the appropriate limitation. We say it should be for customers that use the import functionality. And we think that's the appropriate limitation when they are asking for all requests for proposals or solicitations to bid that our company has ever put out for

Palantir Government.

THE COURT: I do find that 81 is overbroad and unduly burdensome as it is presently phrased. I think it is appropriate for you though to provide a response that is limited to requests for proposals that include a request for software that would be, that would allow for the importability of i2 software or proposals for solicitations that ask for that. And any responses that highlight that that is a feature that is provided whether asked for in the request for proposal or not.

So, that if a proposal comes in and says, I want a product, and you send out a response to the request that says, our product has A, B and C, and one of those elements is the importability of i2 information, then that response would also have to be provided.

Okay. So, there has to be some either request or indication in the submission that you are doing that relates to the importability of the i2 information.

Okay.

MR. PAGE: Thank you, Your Honor.

THE COURT: Thank you. Okay. Well, I look forward to hearing from you all on Monday.

MR. VIETH: Yes, sir, Your Honor. Point of clarification. We do have an upcoming deposition next week. The timing of production is an issue I would like to at least

raise. We have got a 30(b)(6) deposition, and it relates to some damages issues that these documents are, would be important for. And that is scheduled for Thursday, the 23rd.

I don't know that it is feasible to direct all this to be produced before then, but if at a minimum we could have financial statements, which I don't think are-- I believe those are encompassed within Your Honor's ruling. I doubt if it would be difficult to pull the monthly financials for the relevant time period, and I would hope they wouldn't be redacted.

At a minimum we would ask for that, Your Honor, before that deposition if that's, if the Court is willing.

THE COURT: Okay. Mr. Page, why shouldn't you produce that information?

MR. PAGE: Your Honor, this is something that we are going try to do as expeditiously as possible. I am just not entirely sure that we can get everything that has been ordered out by the 22nd.

The fact that they have set a deposition for the 23rd, that shouldn't require us to respond to everything that this motion to produce for the first time on the 6th is asking for.

THE COURT: Well, I want you all to talk before you leave and try and prioritize what it is that you really think is going to be important from my rulings for this deposition

that is coming up and try and work that out.

I mean, people spent a lot of time setting up deposition schedules, and we don't want to have, you know, start rearranging them because the documents aren't available, or if they haven't been produced, or the deposition has to be reconvened because information was produced after the deposition had been taken.

So, try and figure out, Mr. Vieth, what it really is that would be significant for that deposition. And try and work out getting it to them in sufficient time so that they can look and use it in the deposition in a sufficient manner.

Okay.

MR. PAGE: Thank you, Your Honor.

THE COURT: Thank you.

MR. VIETH: Thank you, Your Honor.

NOTE: The hearing concluded at 12:23 p.m.

------------------------------------------------

C E R T I F I C A T E of T R A N S C R I P T I O N

I hereby certify that the foregoing is a true and accurate transcript that was typed by me from the recording provided by the court. Any errors or omissions are due to the inability of the undersigned to hear or understand said recording.

Further, that I am neither counsel for, related to, nor employed by any of the parties to the above-styled action, and that I am not financially or otherwise interested in the outcome of the above-styled action.

/s/ Norman B. Linnell

Norman B. Linnell

Court Reporter - USDC/EDVA